## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**RYAN CHRISTOPHER CHEATHAM,**

     **Plaintiff,**

     **v.**　　　　　　　　　　　　　　　**CASE NO. 25-3091-JWL**

**JESSE HOWES, et al.,**

     **Defendants.**

## MEMORANDUM AND ORDER

Plaintiff brings this pro se civil rights case under 42 U.S.C. § 1983. Although Plaintiff is currently incarcerated at the El Dorado Correctional Facility in El Dorado, Kansas ("EDCF"), his claims are based on incidents occurring during his incarceration at the Lansing Correctional facility in Lansing, Kansas ("LCF"). On October 27, 2025, the Court entered a Memorandum and Order (Doc. 36) ("M&O") dismissing claims in Plaintiff's Second Amended Complaint ("SAC") and ordering a *Martinez* Report on Plaintiff's remaining excessive force claim against Defendants Barton and Haog.[1] The M&O provides that "[u]pon the filing of that Report, the Court will screen the remaining excessive force claim in Plaintiff's SAC." (Doc. 36, at 7.) The *Martinez* Report (Doc. 54) (the "Report") was filed on January 30, 2026. This matter is before the Court on Plaintiff's Motion for Preliminary Injunction (Doc. 58), Motion and Objection in Opposition of the Martinez Report (Doc. 59), Motion to Review Submitted Video (Doc. 60), Motion for Sanctions (Doc. 61), Response (Doc. 62), and Motion for Courts to Obtain New Doctor Findings

---

[1] Although Plaintiff has stated that the defendant's surname is "Haog," the affidavit submitted with the Report shows that his name is Nathan Hoag. (Doc. 54–14.) Despite the mislabeling of the affidavit as the "Affidavit of Jerry Barton," the body of the affidavit shows that it is actually the affidavit of Nathan Hoag. The Waiver of Service (Doc. 38) also reflects that Defendants' names are Jerry Barton and Nathan Hoag.

from El Dorado Correctional Staff (Doc. 63).

The Court's M&O directing the KDOC to submit a *Martinez* Report explicitly provides that "[n]o motion or other document addressed to the SAC shall be filed until the Court has reviewed the *Martinez* Report and entered an order screening the SAC." (Doc. 36, at 8.) In complete disregard for the Court's order, Plaintiff has filed six documents since the *Martinez* Report was filed on January 30, 2026.

## I. Motion for Preliminary Injunction (Doc. 58)

In his motion seeking a preliminary injunction, Plaintiff asks the Court to order another MRI of Plaintiff's forearm, arguing that the medical records submitted with the Report contain a misrepresentation of the "evidence/imaging results." (Doc. 58, at 1.) Plaintiff claims that his "right forearm has a deformity in the muscle tissue." *Id.* Plaintiff claims that there was no follow up by a doctor at EDCF. *Id.* Plaintiff claims that the medical records relate to Plaintiff's right wrist, not his forearm. *Id.* He seeks another MRI or to have a doctor re-examine his forearm. *Id.*

Bryan Wilson, MD, works for Centurion as a Physician at LCF. (Doc. 54–2, at 1.) Dr. Wilson submitted an affidavit with the Report, and based upon his review of Plaintiff's medical records, provided a non-exhaustive summary of the medical care received by Plaintiff after March 13, 2025, as follows:

> 8. On March 13, 2025, Mr. Cheatham had an emergency response nursing visit due to being found unresponsive on the floor of his cell. There is nothing in the records that indicate Mr. Cheatham suffered an arm injury, or complained of any arm injury on this date.
> 9. On March 14, 2025, Mr. Cheatham had an Active Therapy visit. There is nothing in the records that indicate Mr. Cheatham complained of an arm injury during this visit.
> 10. On March 14, 2025, Mr. Cheatham had a dental exam. There is nothing in the records that indicate Mr. Cheatam complained of an arm injury during this visit.
> 11. There is nothing in the medical records that indicate Mr.

Cheatham requested medical treatment for any reason or complained of an arm injury on March 15, 2025.

12. There is nothing in the medical records that indicate Mr. Cheatham requested medical treatment for any reason or complained of an arm injury on March 16, 2025.

13. There is nothing in the medical records that indicate Mr. Cheatham requested medical treatment for any reason or complained of an arm injury on March 17, 2025.

14. On March 18, 2025, Mr. Cheatham turned in a sick call request for an injury to his right wrist as a result of force used by a correctional officer. The sick call request was dated March 14, 2025, but Mr. Cheatham did not turn in the request until March 18, 2025.

15. Mr. Cheatham should have been aware of the proper procedures for requesting medical care, and he frequently utilizes medical services available to him.

16. On March 18, 2025, five (5) days after the alleged altercation with correctional officers, was the first time Mr. Cheatham submitted a complaint to the facility regarding his alleged arm injury.

17. On March 18, 2025, Mr. Cheatham was transferred from LCF to Larned State Correctional Facility.

18. On March 18, 2025, Mr. Cheatham had a medical consultation due to his facility transfer, which was the first time he mentioned to medical staff that he suffered a right forearm injury due to an altercation with correctional officers at LCF.

19. On May 21, 2025, Mr. Cheatham underwent an ultrasound of his right upper extremity, which showed normal tissue with no discreet nodules.

20. On July 22, 2025, Mr. Cheatham underwent an MRI of his right wrist, which showed arthritic changes to his wrist; but there was no acute trauma presented.

21. There is nothing in the medical records that indicates Mr. Cheatham suffered any fractures to his right wrist or arm, or that he strained or tore any muscles or ligaments in his arm, due to the alleged altercation with correctional officers on March 13, 2025.

*Id*. at 2–3.

Plaintiff seeks another MRI or to have a doctor re-examine his forearm. To obtain a preliminary injunction, the moving party must demonstrate four things: (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of the equities tip in the movant's favor; and (4) that the

injunction is in the public interest. *Little v. Jones*, 607 F.3d 1245, 1251 (10th Cir. 2010). "[A] showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.,* 356 F.3d 1256, 1260 (10th Cir. 2004).

Plaintiff claims that there was no follow up by a doctor at EDCF. This case does not involve claims regarding Plaintiff's medical care at EDCF. On March 18, 2025—a few days after the incident—Plaintiff was transferred from LCF to the Larned Correctional Mental Health Facility. (Doc. 54–1, at 2.) He was transferred to EDCF on September 2, 2025. *Id.* Plaintiff's SAC does not include claims regarding his medical care at EDCF, and he has not named any EDCF staff as defendants.

Plaintiff does not allege that he will suffer irreparable harm if his preliminary injunction is not granted. Plaintiff's allegations do not establish that injury is certain and not theoretical, or more than merely feared as liable to occur in the future. "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Heideman v. S. Salt Lake City,* 348 F.3d 1182, 1189 (10th Cir. 2003) (internal quotation marks omitted). A preliminary injunction is only appropriate "to prevent existing or presently threatening injuries. One will not be granted against something merely feared as liable to occur at some indefinite time in the future." *State of Connecticut v. Commonwealth of Massachusetts,* 282 U.S. 660, 674 (1931).

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A preliminary injunction is appropriate only when the movant's right to relief is clear and unequivocal. *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005). Moreover, a federal court considering a motion for preliminary injunctive relief affecting the

conditions of a prisoner's confinement must give "substantial weight to any adverse impact on public safety" and on prison operation.  18 U.S.C. § 3626(a)(2).  Finally, a mandatory preliminary injunction, such as the one sought by Plaintiff, which requires the non-moving party to take affirmative action, is disfavored and therefore requires the moving party to make a heightened showing of the four factors above.  *Little*, 607 F.3d at 1251.  Because preliminary injunctions and TRO's are drastic remedies—"the exception rather than the rule—plaintiffs must show that they are clearly and unequivocally entitled to relief." *Adrian v. Westar Energy, Inc.*, No. 11-1265-KHV, 2011 WL 6026148, at *3 (D. Kan. 2011) (citations omitted).

Plaintiff has not shown that injunctive relief is warranted at this time.  The Court finds that Plaintiff has not met his burden to make a heightened showing that entry of a preliminary injunction is warranted; he has not demonstrated a likelihood of success on the merits such that his right to relief is clear and unequivocal.  Plaintiff's motion is denied.

## II.  Motion and Objection in Opposition of the Martinez Report (Doc. 59)

Plaintiff has also filed an objection to the Report.  (Doc. 59.)  Plaintiff argues that the Report does not include any video footage of the incident.  *Id*. at 1.  Plaintiff claims that he requested the footage within a reasonable amount of time to enable the Warden to save the footage. *Id*.  Plaintiff alleges that he was subjected to excessive force on March 13, 2025.  On July 9, 2025, Plaintiff filed a motion seeking the video footage.  (Doc. 10.)  On July 16, 2025, the Court entered a Memorandum and Order putting the KDOC on notice to retain any video footage of the incident. In the Report, the KDOC indicates that the Court's Memorandum and Order was the first notice it had to find and retain the video footage, and by that time it was no longer available.  (Doc. 54, at 3–4.)  The Report provides that:

> On or about July 9, 2025, Plaintiff filed Document 10 titled "Motion
> to Seize or Order Emergency Production of Video Footage from

March 13, 2025, Lansing Incident Involved Use of Force." The Court then entered a Memorandum and Order on July 16, 2025, granting to the extent that KDOC be given a copy of the Court's July 16, 2025, Memorandum and Order and that any video footage of March 13, 2025, of the alleged incident be retained for potential future production. (See Doc. 13). This is the first notice to KDOC to find and retain video footage in this case.

Video footage from March 13, 2025, was not found as any video footage by the time the July Memorandum and Order was given the video footage had been lost. According to LCF Plant Supervisor and former Use of Force Lieutenant, Jeremy Jewell, the footage from March 13, 2025, would have had to be preserved no later than May 12, 2025. (Exhibit 15, ¶ 13–14). Mr. Jewell became aware of the need for video footage in July 2025 after KDOC's receipt of the Court's July 16, 2025, [sic] which Mr. Jewell refers to as attached Exhibit A to his affidavit. (Id., ¶ 9). Mr. Jewell was unable to find video footage regarding the Plaintiff for March 13, 2025. (Id., ¶ 11).

*Id*. at 3–4.  In his affidavit, Mr. Jewell states that:

LCF's retention schedule for video footage is approximately every 60 days.  The camera systems retain footage based on the amount of foot traffic it observes.  The more foot traffic, the more data is made and the shorter length of time the footage is retained due to limited space for footage to be held.  Therefore, video footage is accessible and can be preserved within approximately 60 days of the date in question.  After the lapse of those 60 days the video footage is no longer available and cannot be located, viewed, saved, or preserved. This is like most common home security recording systems as it prevents excessive retention of digital media, reduces costs, and limits exposure to safety and security breaches. . . . Had I received any requests to preserve the video footage by May 12, 2025 (which is 60 days from March 13, 2025), I likely would have been able to preserve and turn over the video footage.  If the alleged incident occurred in a high foot traffic area, the time for preservation would be even shorter.

(Doc. 54–15, at 2–3.)

This Court has addressed the KDOC's retention of videos in other cases pending before this Court.  In *Bellamy*, the Court noted that the KDOC filed a response "indicating that the KDOC does not routinely retain footage of every physical altercation and . . . video footage is only retained

6

for 45 days . . . ." *Bellamy v. Kansas*, 2023 WL 8622222, at *2 (D. Kan. Dec. 13, 2023).   The Court noted that it had already addressed this issue in dismissing the case.  *Id.* (citing *Washburn v. Harvey Cnty. Jail*, 2019 WL 1429271, at *1 (D. Kan. 2019) (denying request for production of video where KDOC counsel indicated that no such video existed and that "if such footage ever existed, it would have been overwritten in the ordinary course absent the occurrence of any incident that warranted its preservation"); *Erwin v. Zmuda*, 2022 WL 103278, at *16 (D. Kan. 2022) (where officer told plaintiff the video was unavailable, the court found that "plaintiff's conclusory allegations that he believes the video was available and that the officer simply lied to him fail to state a plausible claim for the denial of a constitutionally protected right")); *see also Lamb v. Kelly*, 2024 WL 1434520, at n.4 (D. Kan. April 3, 2024) (noting that "[s]ecurity footage is not saved because TCF does not have the storage capacity to retain data for all disciplinary actions or claims indefinitely . . . [s]ecurity footage is automatically overwritten every 14 days").

Plaintiff again takes issue with the medical records submitted with the Report and argues that the MRI results are only of Plaintiff's wrist, not his forearm.  (Doc. 59, at 2.)  Plaintiff claims that he has a "quarter-size" deformity on his forearm where the food port dug into his arm.  *Id.* at 3.  Plaintiff then states that he "is currently exhausting his administrative remedies to start a claim on the matter."  *Id.*

Plaintiff claims that he cannot respond to the Report without being able to review his medical file and he needs to possess a copy. (Doc. 59, at 2.)  The KDOC has provided that Plaintiff will have the opportunity to view his medical records in Exhibit 2 for reasonable periods of time and means.  Therefore, Plaintiff should request a time to view the medical records through the facility.

Plaintiff also asserts that he needs a lawyer and an expert witness to prove his allegations.

*Id.* Plaintiff includes an affidavit from the inmate that was Plaintiff's cell mate at LCF at the time of the incident on March 13, 2025. (Doc. 59–1.) Plaintiff's cell mate states that while Plaintiff was being uncuffed, Officers Hoag and Barton "pulled extremely hard on the free cuff and was twisting inmate Cheatham's right wrist." *Id.* The cell mate claims that Plaintiff put in a sick call as instructed, was never seen, and was transferred back to Larned. *Id.*

Plaintiff's request for the appointment of counsel is denied. There is no constitutional right to appointment of counsel in a civil case. *Carper v. DeLand*, 54 F.3d 613, 616 (10th Cir. 1995). "Rather, a court has discretion to *request* an attorney to represent a litigant who is proceeding in forma pauperis" in a civil case. *Johnson v. Johnson*, 466 F.3d 1213, 1217 (10th Cir. 2006) (emphasis added) (citing 28 U.S.C. § 1915(e)(1)). In other words, if this motion is granted, it means only that the Court will request that an attorney volunteer to be appointed to represent Plaintiff at no cost to Plaintiff. The Court cannot guarantee that an attorney will volunteer. *See Rachel v. Troutt*, 820 F.3d 390, 396 (10th Cir. 2016) ("Courts are not authorized to appoint counsel in § 1983 cases; instead, courts can only 'request' an attorney to take a case.").

The decision whether to appoint counsel—meaning to request counsel to provide representation at no cost to Plaintiff—in a civil matter lies in the discretion of the district court. *Williams v. Meese*, 926 F.2d 994, 996 (10th Cir. 1991). The burden is on the applicant to convince the court that there is sufficient merit to his claim to warrant appointment of counsel. *Steffey v. Orman*, 461 F.3d 1218, 1223 (10th Cir. 2006) (citing *Hill v. SmithKline Beecham Corp.*, 393 F.3d 1111, 1115 (10th Cir. 2004)). It is not enough "that having counsel appointed would have assisted [the prisoner] in presenting his strongest possible case, [as] the same could be said in any case." *Steffey*, 461 F.3d at 1223 (citing *Rucks v. Boergermann*, 57 F.3d 978, 979 (10th Cir. 1995)).

8

In deciding whether to request volunteer counsel for Plaintiff, the Court has considered "the merits of the prisoner's claims, the nature and complexity of the factual and legal issues, and the prisoner's ability to investigate the facts and present his claims." *Rucks*, 57 F.3d at 979; *Hill*, 393 F.3d at 1115. The Court concludes in this case that (1) it is not clear at this juncture that Plaintiff has asserted a colorable claim against a named defendant; (2) the issues are not complex; and (3) Plaintiff appears capable of adequately presenting facts and arguments. Thus, the Court denies the request for appointment of counsel  The Court denied Plaintiff's prior motion for appointment of counsel without prejudice to refiling if this matter survives screening. (Doc. 7.)

### III.  Motion to Review Submitted Videos (Doc. 60)

Plaintiff asks the Court to direct the KDOC to allow Plaintiff to review the videos filed under seal and to provide Plaintiff with a copy of the videos. (Doc. 60, at 1.) Plaintiff states that he wishes to release his copy to his family and potential attorneys. *Id.*

The only sealed exhibits to the Report include Plaintiff's medical records (Exhibit 2) and IMPP 12-111A (Exhibit 11). Neither exhibit includes videos. The KDOC has provided that Plaintiff will have the opportunity to view his medical records in Exhibit 2 for reasonable periods of time and means. Therefore, Plaintiff should request a time to view the medical records through the facility. Exhibit 11 is KDOC's IMPP 12-111A, *Use of Force*, which has been designated as "Staff Read Only," deeming the release to be detrimental to the safety and security of its operations. The Court granted the KDOC's motion prohibiting Plaintiff's access to Exhibit 11. *See* Doc. 53, at 1. Therefore, Plaintiff's motion to view and receive copies of "videos" is denied.

### IV.  Motion for Sanctions (Doc. 61)

Plaintiff seeks to impose sanctions against Defendants due to their failure to preserve the security camera footage and "for submitting an incomplete and misleading Martinez report in

violation of this Court's order." (Doc. 61, at 1.) Plaintiff claims that Defendants violated the Court's order to preserve the video. *Id*. Plaintiff claims that they "failed to provide any explanation for its absence" and that sanctions under Fed. R. Civ. P. 11 are warranted. *Id*. at 1–2. Plaintiff claims that Defendants' failure to preserve and produce the footage occurred after the Court imposed a clear duty to do so. *Id*. at 3. Plaintiff asks the Court to deem the Report incomplete and allow his claims to survive screening. *Id*. at 6. Plaintiff also asks the Court to appoint counsel. *Id*.

Plaintiff's motion seeking sanctions is denied. As set forth above, the KDOC did provide an explanation as to why no video footage exists. The footage was no longer available by the time Plaintiff's requested it. Plaintiff's motion for sanctions is denied. Plaintiff's request for the appointment of counsel is denied as set forth above.

## V. Response (Doc. 62)

Plaintiff submitted another response to the Report. (Doc. 62.) Plaintiff disputes that his injury was to his "right wrist," and claims that he "was seen about knot being visible in right forearm." *Id*. at 1. Plaintiff states that he claimed that his right wrist was "twisted to the point of breaking, not that it was broke." *Id*. Plaintiff claims that Mr. Jewell knew in July that Plaintiff requested that the video footage from March 13, 2025, be saved at the direction of the Court. *Id*. at 2. Plaintiff claims he did not take any steps to notify the Court as to any attempt to save the video or the inability to produce it until the Report was filed. *Id*. Plaintiff also disputes Defendants' position that they have no recollection of the March 13 interaction with Plaintiff. *Id*. Plaintiff also claims that the event did happen even though the Report states that there is no "use of force" documentation for the alleged incident. *Id*. at 3. Plaintiff also attaches a September 25, 2025 Health Services Request Form seeking to be seen for "knots in right forearm in pain," and

the affidavit from his cell mate that was also attached to his Motion and Objection at Doc. 59. (Doc. 62–1, at 2, 11.)

## VI.  Motion for Courts to Obtain New Doctor Findings (Doc. 63)

Plaintiff states that he saw a doctor at EDCF on February 13, 2026, and asks the Court to obtain the findings from the visit.  (Doc. 63.)  Plaintiff claims that Dr. Harrad confirmed that Plaintiff sustained an injury to his "forearm" and ordered another MRI.  *Id.*  Discovery has not been initiated in this case and Plaintiff's request is premature.  As set forth below, the Court is addressing exhaustion prior to addressing the merits of Plaintiff's claims.  Plaintiff's motion is denied.

## VII.  Exhaustion

The issue that Plaintiff does not address in his motions and responses is exhaustion.  The only time he mentions it is in his Motion and Objection in Opposition of the Martinez Report (Doc. 59) where he takes issue with the medical records submitted with the Report and argues that the MRI results are only of Plaintiff's wrist, not his forearm.  (Doc. 59, at 2.)  Plaintiff claims that he has a "quarter-size" deformity on his forearm where the food port dug into his arm.  *Id.* at 3. Plaintiff then states that he "is currently exhausting his administrative remedies to start a claim on the matter."  *Id.*

Plaintiff filed this case on May 12, 2025.  The Court noted in its Memorandum and Order at Doc. 7 that "Plaintiff's allegations suggest that he did not fully exhaust his administrative remedies prior to filing this action," and that based on the timing of his filing "it appears that Plaintiff did not fully exhaust his administrative remedies prior to filing this case."  (Doc. 7, at 19.) The Court found in its July 7, 2025 Memorandum and Order (Doc. 9) that Plaintiff had filed a "Motion for Permission and or Further Instructions to File Amended Complaint Despite Grievance

11

not being Returned at Level 1" (Doc. 8).  (Doc. 9, at 1.)  The Court noted that Plaintiff, in his motion, seemed to acknowledge that he had not exhausted prior to filing this action, and was seeking instructions on how to finish exhaustion.  *Id.* at 2.

In the Court's July 22, 2025 Memorandum and Order (Doc. 16) the Court noted that Plaintiff was "attempting to wait to file his amended complaint until after he has fully exhausted his administrative remedies."  (Doc. 16, at 2.)  The Court found that any further extension of time to allow Plaintiff to exhaust would be futile, because the PLRA requires exhaustion *before* filing a complaint.  *Id.*

The Report provides that:

> Corrections Manager II, Darcie Holthas [sic], is tasked with the responsibility of acting as the Secretary of Corrections [sic] designee in receiving, review [sic], and responding to KDOC resident [sic] emergency and non-emergency grievances. (Exhibit 16, ¶ 1 – 4). Ms. Holthaus received an emergency grievance from Plaintiff on or about March 27, 2025. (Id., ¶10). This emergency grievance claimed excessive use of force by Barton and Hoag during the "2 – 10 shift between [hours] 8:00 – 9:30" were [sic] Plaintiff sustained an injury in the form of a "knot" to his right wrist. (Exhibit 3, page 1). Upon review, Ms. Holthaus did not find the emergency grievance to meet the standards of an emergency pursuant to K.AR. 14-15-106 and directed Plaintiff to follow the proper grievance procedures in K.A.R. 14-15-101 and 14-15-102. (Exhibit 16, ¶ 12 and 13). This grievance does not fully proceed through the regular grievance  procedures and Plaintiff failed to exhaust on this grievance.
>
> Ms. Holthaus then receives another grievance from Plaintiff that was sent directly to the Secretary of Corrections to review to which she gave response on or about August 6, 2025. (Exhibit 16, ¶ 15 - 16). At the same time, LCF Warden's office received a grievance numbered A 20216-016 on August 5, 2025. (Exhibit 3, page 17). A response was given by both Ms. Holthaus and the LCF Warden's office just 2 days apart. (Exhibit 16, ¶ 16). Ms. Holthaus's response being first, indicating Plaintiff did not follow grievance procedure and awaited the facility to respond or could address his issues first. Based on the documentation, Ms. Holthaus has concluded Plaintiff had failed to properly and fully exhaust his administrative remedy in accordance with the grievance procedures.

(Exhibit 16, ¶ 17). Additionally, Ms. Holthaus found no personal injury claims with KDOC from Ryan Christopher Cheatham for the claimed injury date of March 13, 2025. (Id., ¶ 18).

There is, however, documentation of letters Plaintiff had sent to Kansas Governor Laura Kelly which were then sent to KDOC Classification and Case Management Administrator, Meghan Davis, for response to Plaintiff on the concerns and allegations of his letter. (Exhibit 4). This letter included the allegations of the excessive use of force by LCF staff resulting in an injury on March 13, 2025. (Id.). Ms. Davis had received the letter from the Governor's Office on or about May 7, 2025. (Exhibit 18, ¶ 8 and 9). She was also unable to find records of the incident, movement on March 13, 2025, or reports of injury to Plaintiff. (Id., ¶ 11 – 12). Ms. Davis responded on May 16, 2025, in a letter to Plaintiff which echoed her findings. (Exhibit 4).

Plaintiff then sent another letter to Governor Laura Kelly again, this letter was dated July 12, 2025, with some copies of some other papers. (Id.). Again, Ms. Davis sent a responsive letter back dated July 29, 2025. (Id.) This ended in another letter sent directly to Ms. Davis from Plaintiff, dated August 13, 2025, again mentioning the alleged use of force for March 13, 2025, which resulted in injury. (Id.).

(Doc. 54, at 7–9) (errors in original).

For Kansas state prisoners, the administrative remedies require the inmate to seek an informal resolution with personnel who work with the inmate on a daily basis. K.A.R. § 44–15–101(b). If the informal resolution is unsuccessful, the inmate must progress through a three-level process that includes submitting a grievance report form to (1) the appropriate unit team member, (2) the warden of the facility, and (3) the office of the secretary of corrections. K.A.R. § 44–15–101(d). The procedure to follow at each level is described in detail in the Kansas Administrative Regulations. § 44–15–102; *see also Garza v. Correct Care Solutions*, 2011 WL 2580299, at *2 (D. Kan. 2011), *aff'd* 451 F. App'x 775 (10th Cir.) (granting summary judgment for failure to exhaust claims against Correct Care Solutions where plaintiff failed to allege that he sought relief on his claims first through his unit team, then the warden, and finally from the Secretary of Corrections).

This Court has held that:

> The regulations do not provide for exhaustion "by default" if the informal resolution is unsuccessful. If an inmate does not receive a response to a grievance, they "may move to the next stage of the grievance procedure if a timely response is not received at any step in the grievance process." K.A.R. 44-15-101b. "If an inmate does not receive a response from the unit team within 10 calendar days, a grievance report may be sent to the warden without the unit team signature or signatures." K.A.R. 44-15-102(a)(2).

*Clay v. Esparza*, 2020 WL 6117856, at *4 (D. Kan. 2020).

In *Kidd v. Baker*, the plaintiff alleged that he filed emergency grievances. *Kidd v. Baker*, 2022 WL 17485932, at *6 (D. Kan. 2022). The Court concluded that the plaintiff failed to exhaust his administrative remedies, stating that "[w]hile he sent letters or 'petitions' to the Secretary of Corrections, he did not follow the established procedure." *Id*. "Simply presenting a defective or non-complying grievance . . . does not constitute exhaustion of remedies." *Id*. (quoting *Brewer v. Mullin*, 130 F. App'x 264, 265 (10th Cir. 2005)).

An inmate is required by the Prison Litigation Reform Act ("PLRA") to exhaust all available prison administrative remedies before filing a complaint in federal court. Section 1997e(a) expressly provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a); *see also Little v. Jones*, 607 F.3d 1245, 1249 (10th Cir. 2010) (stating that under the PLRA "a prisoner must exhaust his administrative remedies prior to filing a lawsuit regarding prison conditions in federal court") (citations omitted). "Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the

14

initiation of a federal case." *Porter v. Nussle*, 534 U.S. 516, 524–25 (2002) (citation omitted); *see also Jones v. Bock*, 549 U.S. 199, 219 (2007) (stating that "the benefits of exhaustion include allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record") (citations omitted).

This exhaustion requirement "is mandatory, and the district court [is] not authorized to dispense with it." *Beaudry v. Corrections Corp. of Am.*, 331 F.3d 1164, 1167 n. 5 (10th Cir. 2003), *cert. denied*, 540 U.S. 1118 (2004); *Little*, 607 F.3d at 1249.   A prison or prison system's regulations define the steps a prisoner must take to properly exhaust administrative remedies and a prisoner "may only exhaust by properly following all of the steps laid out" therein.   *Little*, 607 F.3d at 1249 (citing *Woodford v. Ngo*, 548 U.S. 81, 90 (2006)).   "An inmate who begins the grievance process but does not complete it is barred from pursuing a § 1983 claim under [the] PLRA for failure to exhaust his administrative remedies." *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002) (citation omitted).   "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218.

In a suit governed by the PLRA, failure to exhaust is an affirmative defense and the defendant has the burden of proof regarding exhaustion of administrative remedies.   *Roberts v. Barreras*, 484 F.3d 1236, 1241 (10th Cir. 2007).   "Although a defendant bears the burden of 'proving that the plaintiff did not [exhaust his] administrative remedies,' once the defendant has carried that burden, 'the onus falls on the plaintiff to show that remedies were unavailable to him.'"

*May v. Segovia*, 929 F.3d 1223, 1234 (10th Cir. 2019) (alteration in original) (citing *Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir. 2011)).

The issue of Plaintiff's failure to exhaust his available administrative remedies prior to filing his lawsuit must be determined before reaching the merits of his lawsuit. *Little*, 607 F.3d at 1249 ("unexhausted claims cannot be brought in court") (citation omitted); *see also Jernigan*, 304 F.3d at 1032 (an inmate who does not complete the grievance process is barred from pursuing a §1983 claim). Under the PLRA "a prisoner must exhaust his administrative remedies prior to filing a lawsuit regarding prison conditions in federal court." *Little*, 607 F.3d at 1249 (citations omitted). Therefore, the Court will grant Defendants an opportunity to file a dispositive motion on the issue of exhaustion. Defendants will be given another opportunity to respond on the merits if Plaintiff's claims are not dismissed for failure to exhaust. Plaintiff should refrain from filing anything other than a proper response to any dispositive motion that is filed by Defendants.

**IT IS THEREFORE ORDERED BY THE COURT** that the Clerk is directed to correct the Defendants' names on the docket to Nathan Hoag and Jerry Barton.

**IT IS FURTHER ORDERED** that Plaintiff's motions (Docs. 58, 59, 60, 61 and 63) are **denied.**

**IT IS FURTHER ORDERED** that Defendants are granted until **March 13, 2026,** to file a dispositive motion on the issue of exhaustion.

**IT IS SO ORDERED**.

**Dated February 13, 2026, in Kansas City, Kansas.**

**S/  John W. Lungstrum**
**JOHN W. LUNGSTRUM**
**UNITED STATES DISTRICT JUDGE**