

**2000140145 - DISCIPLINARY REPORT** · Saved

Shows Taggart Darnell Lee

location of incident "A4"

Shows Dangerous contraband write-up.

Date of Alleged offense 3-13-2025.

states Barton Jerry as Staff user name.

Shows Executed on 3-13-2025 at 12:21 Am

Exhibit Taggart Lee Disciplinary Report

# AFFidavit

Comes now inmate Taggart Lee Legacy # 0126368 being duely sworn and states under the penalty of perjury that the foregoing are true and correct.

On March 13, 2025 while being cell mates with inmate Ryan Cheatham 2000064842, Legacy # 96193, in A4 cellhouse at the lansing Correctional Facility. Officer Barton slammed inmate Cheatham extremely hard against the wall in the cell house. After inmate Cheatham and Myself was placed back into our cell A4 cell 122, inmate Cheatham was being uncuffed and as he stuck his right arm out to finish being uncuffed officer Haog and officer Barton pulled extremely hard on the free cuff and was twisting inmate Cheatham's right wrist and was making comments of " we will brake this arm, we will snap your shit " " you want us too? " After the incident Cheatham requested Medical attention but was denied and told to put in a sick-call which he did and was never seen. He was eventually transfered back to larned. officer wayne was the officer who Cheatham ask to see medical to and was given a sick-call.

X _____   Taggart lee #126368  Athena# 2000140145

www.madisonpaper.com



NOTARY PUBLIC - State of Kansas
LARRY JOHNSON
MY APPT. EXPIRES 4/2/2029

Exhibit AFFidavit Taggart Lee

www.madisonpaper.com

# AFFidavit

Comes now Ryan Cheatham 2000064842 being duly sworn and states under the penalty of perjury that the foregoing are true and correct.

On March 13, 2025 while at the lansing Correctional Facility, I was reaching out the food port/bean whole to hand officer Barton and officer Hoag My Loose cuff so that the other uff still on My right worist could be un-cuffed and officer Barton and officer Hoag grabbed the free uff and pulled so hard on it that the top of the ood port/bean whole dug into My right forearm. fficer Barton stated "we will snap your shit", you want us too? I put in a sick-call to be seen because the next day My arm was extremely swollen and red, I was never seen and was transfered back to the Larned Correctional facility.

 2000064842

NOTARY PUBLIC - State of Kansas
LARRY JOHNSON
MY APPT. EXPIRES 4/2/29

Exhibit Sick-call displaced muscle

# Health Services Request Form

Exhibit Sick-call displaced
muscle.

| For Medical Use Only<br>Sólo para uso médico | |
|---|---|
| Date Received: | 9/26/25 |
| Time Received: | 0300 |

20 000 64842

Print Name (Imprimir nombre): Ryan Cheatham CHEATHAM

Date of Request: 9-25-25

ID #: 96193          Date of Birth (Fecha de nacimiento): 4-8-89

Housing Location (Ubicación de la vivienda): B1 220

Nature of problem or request (Naturaleza del problema o solicitud): need to be
seen for knots in right forearm, in pain.
need to be seen~

I consent to be treated by health staff for the condition described.
(Da su consentimiento para ser tratada por el personal de salud para la condición descrita.)

I understand that my requesting health services does not necessarily mean that I agree that I should be assessed a charge for healthcare services. If I disagree with any charges assessed, I understand I may file a grievance with the Warden as per KAR 44-15-101 et seq. I understand that a $2.00 fee will be assessed for any sick call visit and any non-emergency visit to health care staff if it is not a follow-up visit or referral.

(Entiendo que mi solicitud respect de recibir servicios de salud no necesariamente inplica que estoy de acuero en que se me cobren cargos por dichos servicios de salud. Comprendo que, en caso de no estar de acuero con el cobro de algún cargo, puedo presentar un reclamo ante el Alcalde, de conformidad con las reglamentaciones del KAR 44-15-101 et seq. Tengo entendido que el personal de salud cobrará un arancel de $2.00, por cualquier visita a un enfermo o visita que no sea de ugencia, si no se trata de una visita de seguimiento o por una derivación.)

935
9-26

_____
Patient Signature (Paciente Firma)

Right
Proximal
Foreamm
Distal Elbow
Rope type
displaced
muscle
⊕ Full ROM
Pain w/ movement

**Place the slip in medical request box or designated area.**
**(Pon este articulo en la caja médica u otra área designada.)**
**Do not write below this area. (No escribe debajo de esta área.)**

(Original – Medical Record, Yellow Copy – Inmate/Patient, Pink Copy – Business Office)

(The area below is not to be used for education, counseling or documenting a clinical encounter)

Triaged by: _____  ☐ Routine  ☑ Urgent  ☐ Emergent

Date: 9/24/25          Time: 0300

Date of Face-to-Face Visit: 9-26-25

Other: _____

Response Recommendation (to be completed by Medical Staff only)

| | | | | | |
|---|---|---|---|---|---|
| Initial | ☑ Nurse | ☐ Doctor | ☐ Dentist | ☐ Eye Doctor | ☐ Mental Health | ☐ ARNP |
| Appointment | ☐ Nurse | ☐ Doctor | ☐ Dentist | ☐ Eye Doctor | ☐ Mental Health | ☐ ARNP |
| Fee Charge | ☐ $2.00 | | | | | |

Comments:

Wrist      Pain w/ Pull ups
Proximal changes

M Brown RN                    9-26-25
_____          _____
Staff Signature                      Date

8-25 MRI No Show — check MRI Results
from Lansing
Plan of Care
F/U MRI — Consult MD Hanrod

Allergy
Sulfa

36
175#
9 30
115/83
P 61
97%
R 18

Centurion: REC-013KS
07/01/2020

centurion

level 3. Grievance Forward to Secretary of Corrections against Lansing officer Barton and Hoag, March 1/3 2025 incident use of force. Forearm injury.

**INMATE REQUEST TO STAFF MEMBER**

To: Secretary of Corrections                                    Date: July 28. 2025

(Name and Title of Officer or Department)

Co11 Bochy

Unit Team, Detail, or Cellhouse Officer's Signature

Exhibit "I"

**To be retained by inmate**

---

Form 9. asking where my level 1 Grievance is on use of Force in Lansing. officer Barton. + officer Haog.

**INMATE REQUEST TO STAFF MEMBER**

To: Unit-team Grahm.                                    Date: 6-29-25

(Name and Title of Officer or Department)

Co11 Panning

Unit Team, Detail, or Cellhouse Officer's Signature

**To be retained by inmate**

---

When was level 2 grievance sent to Lansing

**INMATE REQUEST TO STAFF MEMBER**

To: Penny Riedal                                    Date: 7-22-25

(Name and Title of Officer or Department)

Penny Riedal

Unit Team, Detail, or Cellhouse Officer's Signature

**To be retained by inmate**

---

level 1. Grievance on lansing use of Force, told to file out by Larned Penny.

Tear off and give to inmate when submitted to Unit Team through receiving staff.

Inmate Name  Ryan Cheatham                     Number  96193

Receiving Staff Signature  CO1 Nown          Date  5-9-25

**Effective Date (3-18-96) P-157**

---

warden Easley use of Force Lansing, Instruction to move forward by courts.

Tear off and give to inmate when submitted to Unit Team through receiving staff.

Inmate Name  Ryan Cheatham                     Number  96193

Receiving Staff Signature  _____          Date  7-11-25

**Effective Date (3-18-96) P-157**   Level 2. Grievance.

Exhibit E receipt.

( Exhibit Exhausted Remedies )

714 S.W. Jackson St., Suite 300
Topeka, KS 66603

Jeff Zmuda, Secretary

*FOR Shawn*

*If Mr Cheatham wants to file A grievance Against Lansing – He Can fill out A paper grievance which my office will forward.*
*05-6-25*
*Thanks Penny*

March 28, 2025

TO:    Cheatham, Ryan 0096193

       Larned Correctional Facility

RE:    Emergency Grievance

We received your inmate grievance report form with written arguments.  You directed this grievance to the Secretary as an emergency grievance pursuant to KAR 44-15-106.  It is the conclusion of this office that the matters raised in your grievance form do not constitute an emergency.  Disposition of your grievance according to the regular time limits and procedures will not subject you to a substantial risk of personal injury or cause you other serious and irreparable harm.  Thus, we have concluded that you should not be permitted to bypass efforts to resolve this grievance at the facility level.

Your grievance is being forwarded to the Warden of the facility where you are now housed for review and response in accordance with KAR's 44-15-106, 44-15-101(d)(1) and 44-15-102(b).  We have asked that the facility process your grievance as a regular grievance.

If you have questions or require assistance about the status of your grievance, please contact your unit team.  Otherwise, you can expect to hear from the Warden in reply to your grievance in the near future.

Sincerely,

Darcie Holthaus CMII
Corrections Manager, Facility Management

*document Returned to inmate on 5-6-25*

cc:    Warden Easley
       w/attachments
Image:  SOCRESP
       w/attachments

*Exhibit A.*

Form 9
For Cellhouse Transfer

Exhibit B.

Cheatham
**Last Name Only**

Work Assignment _____
Interview Requests

**KANSAS DEPARTMENT OF CORRECTIONS**

96193
**Number**

To: Mrs. Riedal
Unit-team ~~Grahm~~.          **INMATE REQUEST TO STAFF MEMBER**     Date: 6-29-25.

(Name and Title of Officer or Department)
State completely but briefly the problem on which you desire assistance. (Be specific.)

On 5-6-25 Ms Penny Riedal provided a response to my emergency Grievance filed on 3-22-25, to the secretary of corrections on the matter of a use of force against office Barton and officer Haog, while at the Lansing correctional facility. Penny Riedal also told me to file a paper grievance which I did on 5-9-25. However no response. where is my grievance. its been more then 10 days

Work Assignment: _____     Living Unit Assignment: E-15.

Detail or C.H. Officer: COII Panning

Comment: _____

Disposition: _____
_____
_____
_____

To: _____          Date: 07-03-25
(Name & Number)

Disposition: As I discussed with you - my office did not Receive Any grievance from you for LCF. It will be searched for And I'll let you know if it is found by Anyone, in Addition to checking with Case Mgt staff.

Riedel
Employee's Signature          Exhibit "B"     **To be returned to inmate.**

P-0009

Exhibit "B"

INMATE REQUEST TO STAFF MEMBER

To: _____        Date: _____

(Name and Title of Officer or Department)

_____

Unit Team, Detail, or Cellhouse Officer's Signature          **To be retained by inmate**

**Form 9**
For Cellhouse Transfer
Work Assignment _____
Interview Requests

Cheatham

**Last Name Only**

**KANSAS DEPARTMENT OF CORRECTIONS**

96193

**Number**

**INMATE REQUEST TO STAFF MEMBER**

To: MS Penny Riedal          Date: 7-1-25

(Name and Title of Officer or Department)

State completely but briefly the problem on which you desire assistance. (Be specific.)

Is there any way to get with Warden Easley
on a final despotion of use of Force Grievance
with Lansing since there beyond deadline to
respond. I have until 7-28-25 with courts
thanks

Work Assignment: _____     Living Unit Assignment: E-15

Comment: _____     Detail or C.H. Officer: _____

Disposition: _____
_____
_____
_____
_____

To: _____        Date: 7-2-25

(Name & Number)

Disposition: You would need to Send Anything to LCF Since
it involves that facility
_____

Riedl          Exhibit "C"

Employee's Signature          **To be returned to inmate.**

P-0009



*staples taking out Re-stapled*



**ORIGINAL**

P.O. Box 2
301 East Kansas Ave.
Lansing, KS 66043

**Kansas**
Department of Corrections
*Lansing Correctional Facility*

Phone: (913) 727-3235
Fax: (913) 250-2762
www.doc.ks.gov/facilities/lcf

Jeff Zmuda, Secretary

Laura Kelly, Governor

**TO:**    Cheatham, Ryan 0095193 LCMHF

**From:**    Geither, Gloria Deputy Secretary KDOC

*GG*

**Date:**    August 8, 2025

**Re:** Grievance number:  A 2026-016

**Findings of fact:** You have escalated to grievance a complaint that on 03/13/25 CO Barton and CO Hoag pulled your free cuff through the food port of an unspecified cell between 0800-1000 pm.  This grievance was received by LCF on 08/05/25.

The documentation you provided shows you filed this complaint initially as an emergency grievance directly to central office.  You did not provide a copy of the emergency grievance.  The central office response dated 04/28/25 refused it as an emergency grievance and stated it was being forwarded to LCMHF, your assigned facility at the time.  You have provided a copy of a receipt for documentation signed by an unknown person (not legible) dated 05/09/25. Because it appears you did attempt to address this issue within the required guidelines by sending the emergency grievance directly to central office in March of 26, your grievance will be accepted.

**Conclusions Made:**  Based on additional context, your concern involves allegations of staff misconduct. This administration treats all such allegations with the utmost seriousness and conducts a thorough and individual review of each accusation. Please be assured that these allegations will be investigated appropriately. If any corrective action is deemed necessary as a result of the investigation, please note that the specifics of such action cannot be discussed with you. The appropriate administrator has been informed of this matter.

**Action Taken:** Your complaint will be investigated.

*Inmate cheatham received this copy on 8-27-25*

*If this response is not satisfactory, you may appeal by submitting the appropriate appeal form, available from your Unit Team to the secretary of corrections. You must indicate on the appeal form exactly what you are displeased with and what action you believe the secretary of corrections should take. The appeal must be made withing three calendar days of receipt of this response, or within three calendar days of the deadline for this decision, whichever is earlier.*

*Exhibit "D" ORIGinal*



**COPY**

P.O. Box 2
301 East Kansas Ave.
Lansing, KS 66043

**Kansas**
Department of Corrections
*Lansing Correctional Facility*

Phone: (913) 727-3235
Fax: (913) 250-2762
www.doc.ks.gov/facilities/lcf

Jeff Zmuda, Secretary

Laura Kelly, Governor

**TO:**    Cheatham, Ryan 0095193 LCMHF

**From:**   Geither, Gloria Deputy Secretary KDOC

**Date:**   August 8, 2025

**Re:** Grievance number: A 2026-016

**Findings of fact:** You have escalated to grievance a complaint that on 03/13/25 CO Barton and CO Hoag pulled your free cuff through the food port of an unspecified cell between 0800-1000 pm.  This grievance was received by LCF on 08/05/25.
The documentation you provided shows you filed this complaint initially as an emergency grievance directly to central office.  You did not provide a copy of the emergency grievance.  The central office response dated 04/28/25 refused it as an emergency grievance and stated it was being forwarded to LCMHF, your assigned facility at the time.  You have provided a copy of a receipt for documentation signed by an unknown person (not legible) dated 05/09/25. Because it appears you did attempt to address this issue within the required guidelines by sending the emergency grievance directly to central office in March of 26, your grievance will be accepted.

**Conclusions Made:**  Based on additional context, your concern involves allegations of staff misconduct. This administration treats all such allegations with the utmost seriousness and conducts a thorough and individual review of each accusation. Please be assured that these allegations will be investigated appropriately. If any corrective action is deemed necessary as a result of the investigation, please note that the specifics of such action cannot be discussed with you. The appropriate administrator has been informed of this matter.

**Action Taken:** Your complaint will be investigated.

*~~Defendents~~ Exhibit "D"'s copy Not original, defendants Exh. 3,*

*If this response is not satisfactory, you may appeal by submitting the appropriate appeal form, available from your Unit Team to the secretary of corrections. You must indicate on the appeal form exactly what you are displeased with and what action you believe the secretary of corrections should take.  The appeal must be made withing three calendar days of receipt of this response, or within three calendar days of the deadline for this decision, whichever is earlier.*

**Exhibit 3**

Exhibit "E"

## KANSAS DEPARTMENT OF CORRECTIONS INMATE GRIEVANCE FORM

**INMATE COMPLAINT**

Inmate's Name Ryan Cheatham                    Number 96193

Facility Larned            Housing Unit COH 5/E-18    Work Detail Lay-in

maybe. Hopefully.

**NATURE OF COMPLAINT** BE SPECIFIC. (Include names, dates, places, rules, regulation, etc.; how you have been affected and action you believe the Warden should take.) Use additional paper if necessary. ATTACH DOCUMEN-TATION OF ATTEMPTS AT INFORMAL RESOLUTION PRIOR TO FILING THIS FORMAL GRIEVANCE (i.e. Form 9s or other correspondence and response from staff member). Mr. Easley. I was instructed by the Federal courts, to move to the next step concerning a use of force in Lansing Involving officer Barton and officer Hoag. On 3-13-25 in A4 cell house around 8:00pm - 10:00pm, the officers pulled my free cuff through the food port so hard I have a deformity In my forearm. Please see Attached instructions from courts, is there any way to get with Lansing warden Howes and secretary of corrections, As is a deadline to file Amended complaint is July 28, 2025. thanks. P.S office Lee also should know about incident

Date this report was given to Unit Team for informal resolution (to be completed by inmate). _____

**UNIT TEAM RESPONSE** (Complete and return to inmate within 10 calendar days.)

_____    _____
Unit Team Signature                          Date

**INMATE RESPONSE** (Complete and return to Unit Team within 3 calendar days)

_____ I am satisfied with the Unit Team response and wish to withdraw my formal grievance.

_____ I am not satisfied with the Unit Team response, and wish to forward to the Warden's office. (This must be done within 3 calendar days.) Date forwarded to Warden's Office (to be completed by staff). _____

_____    _____
Inmate Signature                             Date

**`WARDEN RESPONSE** (Complete, attach response and return within 10 Working days.)

Date Received AUG 0 5 2025    Date of Final Answer 080825    Date Returned to Inmate _____

_____    _____    _____    _____
Inmate's Signature                             Date    Unit Team Signature                             Date

If dissatisfied with this response, the inmate may appeal to the Secretary of Corrections within three (3) calendar days of receipt of this decision from the Warden.

**TO BE COMPLETED BY STAFF ONLY**

| | |
|---|---|
| Grievance Serial Number | AA 2026·016 |
| Type of Complaint (Item 4: Code 01-75) | 54 |
| Cause of Complaint (Item 5: Code 01-30) | 01 |
| Type of Response (Item 6a: Code 01,02,08 or 09) | 02 |

level 1 Grievance on lansing use of force, Larned penny to TC to File out by

Tear off and give to inmate when submitted to Unit Team through receiving staff.

Inmate Name Ryan Cheatham                                Number 96193

Receiving Staff Signature COI Nowll                       Date 5-9-25

**Effective Date (3-18-96) P-157**

Exhibit "G"

Form 9
For Cellhouse Transfer
Work Assignment _____
Interview Requests

Cheatham
Last Name Only

KANSAS DEPARTMENT OF CORRECTIONS

96193
Number

INMATE REQUEST TO STAFF MEMBER

To: Secretary of Corrections      Date: July 28-2025-
(Name and Title of Officer or Department)
State completely but briefly the problem on which you desire assistance. (Be specific.)

this is my receipt showing @ I moved forward
with level 3 grievance to you all as instructed by
Courts to DOI involving a incident on March 13. 2025
use of force, officer Barton + Hogg. No other
attempts to Exhaust have been returned to me.

Work Assignment: _____    Living Unit Assignment: E-20.
Comment: _____    Detail or C.H. Officer: Co" Bochy

Disposition: _____

To: _____    Date: _____
(Name & Number)

Disposition: _____

_____    To be returned to inmate.
Employee's Signature
P-0009

Exhibit "I"

Exhibit 3



714 S.W. Jackson St., Suite 300
Topeka, KS 66603

**Kansas**
Department of Corrections

Phone: (785) 296-3317
Fax: (785) 296-0014
kdocpub@ks.gov
www.doc.ks.gov

Jeff Zmuda, Secretary

Laura Kelly, Governor

March 28, 2025

TO:    Cheatham, Ryan 0096193

       Larned Correctional Facility

RE:    Emergency Grievance

We received your inmate grievance report form with written arguments. You directed this grievance to the Secretary as an emergency grievance pursuant to KAR 44-15-106. It is the conclusion of this office that the matters raised in your grievance form do not constitute an emergency. Disposition of your grievance according to the regular time limits and procedures will not subject you to a substantial risk of personal injury or cause you other serious and irreparable harm. Thus, we have concluded that you should not be permitted to bypass efforts to resolve this grievance at the facility level.

Your grievance is being forwarded to the Warden of the facility where you are now housed for review and response in accordance with KAR's 44-15-106, 44-15-101(d)(1) and 44-15-102(b). We have asked that the facility process your grievance as a regular grievance.

If you have questions or require assistance about the status of your grievance, please contact your unit team. Otherwise, you can expect to hear from the Warden in reply to your grievance in the near future.

Sincerely,

Darcie Holthaus CMII
Corrections Manager, Facility Management

cc:    Warden Easley
       w/attachments
Image:  SOCRESP
       w/attachments

**Exhibit 3**

Exhibit "E"
Letter to Easley.

Mr. Easley, on March 13. 2025
I was injuryed by two Black suits
in Lansing, I filed a emergency grievance
and a Darcie Holthaus CMII answered
it stating she was going to forward the
grievance to you, Please see Attached,
or Please come to you and I can Show
you everything in blade and white.
on 5-6-25 Penny Riedal provided
Shawn porkoski a correspondence saying
if I wanted to file a normal grievance
on lansing, she would forwarded it,
I folowed those instructions, and
MS riedal states Lansing nor Herjelf
has My level 1 grievance filed 5-9-25.
I have a copy of the receipt. Now
MS Riedal is saying do the Something I
Just did and got no response, Sir
If you could get with Warden Howes
so we can resolve this, And also
Secretary of corrections. I have until
J-28-25 to file a proper Complaint.
Thank    Respectfully,
         Submitte

Sent to LCF
7-18-25

L   Grievance involving March 13, 2025 incident at
lansing correction

# KANSAS DEPARTMENT OF CORRECTIONS INMATE GRIEVANCE FORM

**INMATE COMPLAINT**

Inmate's Name Ryan Cheatham   B130          Number 96193

Facility Lansed Correction   Housing Unit E-20          Work Detail Lay-in

To the secretary of corrections.

**NATURE OF COMPLAINT** BE SPECIFIC. (Include names, dates, places, rules, regulation, etc.; how you have been affected and action you believe the Warden should take.) Use additional paper if necessary. ATTACH DOCUMENTATION OF ATTEMPTS AT INFORMAL RESOLUTION PRIOR TO FILING THIS FORMAL GRIEVANCE (i.e. Form 9s or other correspondence and response from staff member). I am moving forward as instructed by the courts to do, as lansing facility not returning my level 2 grievance. concerning march 13, 2025 incident. my arm was violently pulled through the bean whole by officer barton and Hoag. I received a MRI and lansed has the results I am Exhausting my administrative remedies. by submitting this last step grievance. I want to be compensated for what the did. open to talk about amount.

Date this report was given to Unit Team for informal resolution (to be completed by inmate). _____

**UNIT TEAM RESPONSE** (Complete and return to inmate within 10 calendar days.)

All previous Attempts to Exhust have not been returned I am moving to the third step.   Exhibit I original

_____
Unit Team Signature                    Date

**INMATE RESPONSE** (Complete and return to Unit Team within 3 calendar days)

_____ I am satisfied with the Unit Team response and wish to withdraw my formal grievance.

_____ I am not satisfied with the Unit Team response, and wish to forward to the Warden's office. (This must be done within 3 calendar days.) Date forwarded to Warden's Office (to be completed by staff). _____

_____          _____
Inmate Signature                                          Date

**`WARDEN RESPONSE** (Complete, attach response and return within 10 Working days.)

Date Received 9/4/25      Date of Final Answer 9/4/25      Date Returned to Inmate

Nduplicate to AA2026-016 mailed to LCMHF 08/15/25
(2nd copy attached)                                      9/4/25

Inmate's Signature          Date      Unit Team Signature          Date

If dissatisfied with this response, the inmate may appeal to the Secretary of Corrections within three (3) calendar days of receipt of this decision from the Warden.

**TO BE COMPLETED BY STAFF ONLY**

Grievance Serial Number                    Nduplicate/Nvalid.

Type of Complaint (Item 4: Code 01-75)          _____

Cause of Complaint (Item 5: Code 01-30)          _____

Type of Response (Item 6a: Code 01,02,08 or 09)          08

DO NOT WRITE BELOW THIS LINE

Level 3 Grievance Invoslying March 13, 2025. incident at
Lansing Correction

## KANSAS DEPARTMENT OF CORRECTIONS INMATE GRIEVANCE FORM

### INMATE COMPLAINT

Inmate's Name Ryan Cheatham                    Number 96193

Facility Lanred Correction    Housing Unit E-20    Work Detail Lay-in

To the secratary of Corrections.

**NATURE OF COMPLAINT** BE SPECIFIC. (Include names, dates, places, rules, regulation, etc.; how you have been affected and action you believe the Warden should take.) Use additional paper if necessary. ATTACH DOCUMENTATION OF ATTEMPTS AT INFORMAL RESOLUTION PRIOR TO FILING THIS FORMAL GRIEVANCE (i.e. Form 9s or other correspondence and response from staff member). I am Moving forward as instructed by the courts to do, as lansing facility not returning my level 2 grievance. concerning march 13, 2025 incident. My arm was violently pulled through the bean whole by officer banton and Hoag. I recced a MRI and larned has the results. I am Exhuisting my administrative remedies. by submitting this last step grievance. I want to be compensated for what the did. open to talk about amount.

Date this report was given to Unit Team for informal resolution (to be completed by inmate). _____

**UNIT TEAM RESPONSE** (Complete and return to inmate within 10 calendar days.)

All previers Attempts to Exhust here not been returned I am moving to the third step. Exhibit I defendants copy

_____    _____
Unit Team Signature                    Date

**INMATE RESPONSE** (Complete and return to Unit Team within 3 calendar days)

_____ I am satisfied with the Unit Team response and wish to withdraw my formal grievance.

_____ I am not satisfied with the Unit Team response, and wish to forward to the Warden's office. (This must be done within 3 calendar days.) Date forwarded to Warden's Office (to be completed by staff). _____

_____    _____
Inmate Signature                    Date

**WARDEN RESPONSE** (Complete, attach response and return within 10 Working days.)

Date Received _____    Date of Final Answer _____    Date Returned to Inmate _____

No date.

_____    _____
Inmate's Signature        Date    Unit Team Signature        Date

If dissatisfied with this response, the inmate may appeal to the Secretary of Corrections within three (3) calendar days of receipt of this decision from the Warden.

### TO BE COMPLETED BY STAFF ONLY

Grievance Serial Number    _____

Type of Complaint (Item 4: Code 01-75)    _____  _____

Cause of Complaint (Item 5: Code 01-30)    _____  _____    Exhibit 3

Type of Response (Item 6a: Code 01,02,08 or 09)    _____  _____

no date



714 S.W. Jackson St., Suite 300
Topeka, KS 66603

**Kansas**
Department of Corrections

Phone: (785) 296-3317
Fax: (785) 296-0014
kdocpub@ks.gov
www.doc.ks.gov

Jeff Zmuda, Secretary

Laura Kelly, Governor

## MEMORANDUM

DATE:       August 6, 2025

TO:         Warden Easley
            Larned State Correctional Facility

FROM:       Darcie Holthaus CMII
            Corrections Manager- Facility Management

SUBJ:       0096193 Cheatham, Ryan
            Attached grievance

We received the attached grievance appeal form from the above noted inmate. We noted that there is no evidence that the inmate has sought assistance from staff at the facility regarding this complaint.

In compliance with K.A.R. 44-15-102 (c) (4), we are forwarding this to you for response to the inmate. On this date, we advised the inmate of our action regarding this complaint. This is the second time you have sent this in as an emergency grievance, it does not meet the requirements for an emergency grievance. You have not utilized the policy correctly, you have not exhausted.

Thank you for your assistance with this matter.

Enclosure-original grievance report form.

Image: SOCRESP
       w/attachments

**Exhibit 3**



**Kansas**
Department of Corrections

# INTERNAL MANAGEMENT POLICY & PROCEDURE

**Applicability:  X ADULT Operations Only  _ JUVENILE Operations Only  _ DEPARTMENT-WIDE**

**IMPP #:  20-104A**                                                **PAGE #: 1 of 6**

<mark>SEGREGATION/RESTRICTIVE HOUSING: Purpose of Administrative Restrictive Housing and Appropriate Placements</mark>

**Original Date Issued: 10-11-21    Replaces IMPP Issued: 10-11-21    CURRENT EFFECTIVE DATE: 05-13-22**

**Approved By:** _____ **, Secretary    Next Scheduled Review:** 06/2024

## POLICY

The inability to isolate disruptive, violent and/or residents capable of influencing violence and disruption in a prison environment compromises the safety of both residents and staff.  Administrative restrictive housing procedures are to be established for the control of residents necessary for purposes other than punishment.  Residents are to be housed in the general population at the lowest appropriate custody level unless circumstances or resident behavior dictate otherwise.  Only residents who require restrictive housing are to be assigned there.  Procedures are to be effectively related to the control of the resident for stated purposes.  These procedures may be increased in scope and extent as necessary to maintain effective control.  When the need to isolate a resident in restrictive housing no longer exists, the resident is to be returned to the general population.

## DEFINITIONS

Restrictive Housing: A generic term used to describe housing which separates residents from the general population for both administrative and disciplinary purposes.

Administrative Restrictive Housing: A form of restrictive housing used for residents who pose a threat to life, property, self, staff, or other residents; or when a resident's continued presence threatens the secure and orderly operation of the facility.

Disciplinary Restrictive Housing: A form of restrictive housing to which a resident can be sentenced following conviction of a rule violation through disciplinary proceedings.

Short-Term Administrative Restrictive Housing: Restrictive housing placement less than 15 days.  For purposes of accounting days, the date of admission to restrictive housing is considered day one (1). Classification categories include:

- Disciplinary Restrictive Housing
- Pending Results of an Investigation (PI)
- To prevent further collaboration, intimidation, or disruption
- Pre-Hearing Detention (PHD)
- Communicable Disease
- Critical Monitoring
- Emergency Situations
- Hold Overs
- Refusing to participate in identification procedures

Long-Term Administrative Restrictive Housing: Restrictive housing placement for 15 or more continuous days which requires comprehensive and individualized planning and services to aid in the return of the resident into the general

population setting. For purposes of accounting days, the date of admission to restrictive housing is considered day one (1): Classification categories include:

- Protective Custody (PC) refer to IMPP 20-108D [Protective Custody]
- Consistent Bad Behavior (CBB)
- Other Security Risk (OSR)
- Capital Punishment

Long-Term Restrictive Housing Committee: A committee comprised of the sending facility Warden, KDOC Risk Manager, KDOC Classification Manager, Enforcement, Apprehension, and Investigations (EAI) Director or designee, and the KDOC Deputy Secretary of Facility Management.

Severe and Persistent Mental Illness (SPMI): A mental health illness that is prolonged and recurrent, impairs activities of daily living and requires long-term treatment.

Single Event: A situation or instance involving a single or series of related actions or behaviors defining a single incident.

## PROCEDURES

I. **General Procedures**

    A.    Residents may be confined in administrative restrictive housing for any of the reasons or conditions articulated within this policy.

        1.    Any resident may be held in administrative restrictive housing under any subsection or combination of subsections of this policy simultaneously.

            a.    If the resident is held under more than one (1) subsection, that fact is to be stated in the administrative restrictive housing report in accordance with IMPP 20-105A.

    B.    Residents with disabilities must be placed in cells that accommodate their disability.

        1.    Residents must not be placed in restrictive housing solely due to their disability or due to the lack of available accessible cells.

    C.    Juveniles, pregnant women or women who recently gave birth, and residents with a severe and persistent mental illness (SPMI) must be considered for alternative placement in the infirmary, a mental health unit or in a unit on a suicide watch or crisis level placement.

        1.    Residents considered to be severely and persistently mentally ill for the purpose of this policy are to be assessed for placement in restrictive housing pursuant to short-term restrictive housing categories only.

II. **Guidelines for Use of Short-Term Administrative Restrictive Housing**

    A.    The time a resident may be placed in any combination of short-term restrictive housing classifications must not exceed 15 days based on a single event. The Warden/Deputy Secretary of Facility Management must approve any placement considered to be Short Term Restrictive Housing resulting in more than 15 days within a 30-day period.

    B.    The conditions of confinement for residents in short-term restrictive housing are to be followed according to IMPP 20-101A.

    C.    Restraints are to be utilized during movement that occurs outside a resident's cell and/or unit, unless the use of restraints worsens a resident's condition, or the use of restraints is unwarranted.

        1.    Exceptions to the use of restraints is to be granted by the Warden, or Chief of Security in the Warden's absence.

        2.    Facility Wardens may establish procedures in General Orders for limited movement without

restraints for residents housed in double-bunked cell assignments, to activities such as showers and recreation.

III.   **Classification Categories and Independent Criteria for Placement in Short-Term Administrative Restrictive Housing**

    A.    Pending results of investigation:

        1.    Residents may be placed in administrative restrictive housing pending the completion of an investigation to determine whether charges are to be brought.

        2.    Any resident held under pending results of an investigation is to be charged or released within three (3) working days, unless a continued holding in administrative restrictive housing under this section is justified in writing and approved by the Warden.

            a.    This notice and explanation is to be provided to the resident in writing.

    B.    To prevent the following:

        1.    Further disruption, if a threat to security and control, including danger to others, continues to exist in the judgment of the Warden.

        2.    The possible intimidation of witnesses or accusers; or

        3.    Communication and collaboration between residents involving an attempt to improperly or dishonestly coordinate the testimony which might be given.

    C.    Pre-hearing detention:

        1.    If necessary to maintain security and control, any resident who has been charged with an alleged violation of law, or a class I or II rule violation, may be held in administrative restrictive housing pending a hearing before the facility disciplinary board, or pending a trial by a court.

            a.    Time served in restrictive housing under pre-hearing detention is to be credited towards a sanction of disciplinary restrictive housing resulting from a disciplinary conviction.

            b.    The resident's status is to be reviewed by the Warden or designee within three (3) working days.

    D.    Communicable disease:

        1.    Any resident whom a Doctor of Medicine, nurse, or nurse practitioner has declared to be carrying any communicable disease, or any resident who refuses to participate in testing for communicable disease, may be placed in administrative restrictive housing status until any danger of a contagion is past.

    E.    Critical monitoring resident:

        1.    As applicable administrative restrictive housing may be applied to the following types of residents.  In the event such placement is made without a hearing, pursuant to Section I.B. of IMPP 20-105A, the Warden or his/her designee is to review the placement.  Residents are to be assessed for application of the Offender Companion Program pursuant to IMPP 10-144A for constant observation.

            a.    Any resident accused of or who has a history of aggressive or forcible sexual attacks may be placed in administrative restrictive housing.

            b.    Any resident with suicidal tendencies may be placed in administrative restrictive

housing under appropriate observation providing the condition is verified by a qualified behavioral mental health professional and a clinical observation is not available.

    c.    Any resident exhibiting self-injurious behavior under appropriate observation and to give clinical staff an opportunity to determine whether the injury is a significant indication of a suicidal tendency.

    d.    Residents with behavioral, mental health, or emotional problems which cause them to be a threat to themselves or others, when that behavioral, mental health or emotional problem has been verified by a psychiatrist or psychologist, may be placed in administrative restrictive housing under appropriate observation when clinical observation is not available.

    e.    Residents suspected to be under the influence of an illicit substance may be placed in restrictive housing under appropriate observation when clinical or unit observation is not available and or not appropriate.

F.    Emergency situations:

    1.    Any resident, or group of residents, may be placed in administrative restrictive housing or secure confinement in the resident(s) own cell(s) if the resident, or residents, engaged in behavior that threatened the maintenance, security, or control of the facility creating an emergency situation that presents a danger to the resident or others.

        a.    A copy of this explanation and justification shall be provided to the Deputy Secretary of Corrections of Facilities Management.

        b.    Placement may continue for up to three (3) working days.

    2.    Any resident who has been determined by the Warden or, in the Warden's absence, by the Deputy Warden, to be an extreme risk of escape may be placed in administrative restrictive housing.

        a.    The reason is to be explained in writing and reference made to the documents or other basis for the placement unless already apparent from the information shown in the resident's record.

        b.    When these staff are absent during an emergency, restrictive housing may be authorized by the highest-ranking officer on duty.

            (1)    The Warden or the Deputy Warden is to review the placement within 24-hours and must either approve continued placement in administrative restrictive housing or direct other appropriate housing.

G.    Holdovers:

    1.    The Warden or designee may place residents in administrative restrictive housing who are identified as holdovers.

        a.    Holdover residents are those residents who fall into one (1) of the following categories:

            (1)    Any newly committed resident awaiting transportation to Topeka or El Dorado Correctional Facility reception and diagnostic unit.

            (2)    Any resident who is otherwise being held in a facility temporarily while in transit between one facility and another; or,

            (3)    Any parolee, conditional releasee, or post-release supervision releasee who has waived a preliminary violation hearing or is being held at a facility

pending a hearing to determine if probable cause exists that a violation of conditions of release occurred.

    b.    A resident is not to be held on holdover status longer than 15 days to accomplish the transfer to another facility.

H.    Refusal to participate:

    1.    A resident may be placed in administrative restrictive housing when the resident refuses to participate in an identification procedure, including fingerprinting and photographing.

I.    Disciplinary Restrictive Housing

    1.    Placement of any resident in disciplinary restrictive housing requires full compliance with all applicable provisions and requirements of the disciplinary procedures set forth within K.A.R. 44-13-101 *et seq.*

## IV.    Guidelines for Use of Long-Term Restrictive Housing

A.    In the event that a resident presents an extended security threat due to violent and/or disruptive behaviors, or the influence of such, the Restrictive Housing Review Board is to complete and submit a long-term restrictive housing referral to the Warden for review and approval.

B.    Restrictive housing placement in excess of 15 days requires extended planning and services for eventual placement into a general population setting.

    1.    Residents on long-term restrictive housing status are to have the same housing standards, conditions of confinement for short-term restrictive housing, and opportunities for three (3) hours or more a day out of cell time.

    2.    Facility General Orders are to specify the process for development of the planning and services specific for each individual resident.

## V.    Classification Categories and Independent Criteria for Placement in Long-Term Administrative Restrictive Housing

A.    Consistent bad behavior:

    1.    Any resident may be placed in administrative restrictive housing indefinitely when the resident's record has shown consistent bad behavior, as evidenced by three (3) single events of documented bad behavior within the preceding 12 months, and when:

        a.    The instances are a substantial threat to the safety and security of the institution or facility; and

        b.    The instances arise from separate fact situations.

    2.    Placement under this classification requires the prior written approval of the warden and is to be within 30 days of approval by the Long-Term Restrictive Housing Committee.

B.    Other security risk:

    1.    The Warden may place in administrative restrictive housing, or secure confinement in the resident's own cell, any resident or group of residents, if the resident or residents have engaged in behavior which has threatened the maintenance, security, or control of the correctional facility.

        a.    The Warden is to, within three (3) working days of the placement, explain in writing the threat to security and show justification for effecting secure confinement under these circumstances to the Deputy Secretary of Facility Management.

      (1)      An exception to the extended planning and services required under long-term restrictive housing placements may be requested with supporting written justification by the Warden.

      (2)      A copy of this explanation and justification shall be provided to the Secretary of Corrections.

C.      Protective Custody:

      1.      Pursuant to IMPP 20-108 [Protective custody] any resident who requests restrictive housing for personal safety, or who the Warden has reason to believe to be in serious and imminent danger, may be placed in administrative restrictive housing if:

            a.      Documentation that protective custody is warranted is provided in writing by the Warden and reasonable alternatives are not available.

            b.      A denial of protective custody is to be fully documented in the EAI file.

## VI.    Timeframes Related to Administrative Restrictive Housing

A.      For purpose of this regulation, the term "working days" means any day except Saturday, Sunday, a holiday, or any other day as authorized by the Governor.

**NOTE:** The policy and procedures set forth herein are intended to establish directives and guidelines for staff, residents and offenders and those entities that are contractually bound to adhere to them. They are not intended to establish State created liberty interests for employees, residents or offenders, or an independent duty owed by the Department of Corrections to employees, residents, offenders, or third parties. Similarly, those references to the standards of various accrediting entities as may be contained within this document are included solely to manifest the commonality of purpose and direction as shared by the content of the document and the content of the referenced standards. Any such references within this document neither imply accredited status by a Departmental facility or organizational unit, nor indicate compliance with the standards so cited. The policy and procedures contained within this document are intended to be compliant with all applicable statutes and/or regulatory requirements of the Federal Government and the state of Kansas. This policy and procedure are not intended to establish or create new constitutional rights or to enlarge or expand upon existing constitutional rights or duties.

## REPORTS

None.

## REFERENCES

IMPP 10-110D, 10-144A, 12-120A, 20-105A, 20-108D

## HISTORY

10-11-21 Original
05-13-22 Revision 1

## ATTACHMENTS

None.

# KANSAS DEPARTMENT OF CORRECTIONS

| | INTERNAL MANAGEMENT POLICY AND PROCEDURE | SECTION NUMBER 12-103D | PAGE NUMBER 1 of 10 |
|---|---|---|---|
| Kansas Department of Corrections | | SUBJECT: SECURITY AND CONTROL:  Offender and Facility Searches | |
| Approved By: [signature] Secretary of Corrections | | Original Date Issued: | 12-12-17 |
| | | Replaces Version Issued: | N/A |
| | | CURRENT VERSION EFFECTIVE: | 12-12-17 |

| APPLICABILITY: | _ ADULT Operations Only | _ JUVENILE Operations Only | X DEPARTMENT-WIDE |
|---|---|---|---|

## POLICY STATEMENT

Offenders shall be subject to search at any time.  Searches shall be conducted by staff in a professional manner. (ACO 2-3A-01, ACI 3-4184) Predetermined random pattern searches of offenders shall be conducted as often as necessary to ensure the safety and security of the facility. (ACO 2-3C-01) Strip searches and body cavity searches shall be conducted on a reasonable belief that the offender is carrying contraband or other prohibited material. Only the warden/superintendent or designee may authorize a body cavity search. (ACI 3-4185) Except in exigent circumstances, strip searches and body cavity searches shall be conducted, in private, by staff of the same sex as the offender being searched. (28 C.F.R. § 115.15) All searches shall be conducted by trained personnel. (ACI 3-4186)

All work detail officers/supervisors and other staff, as identified by the warden/superintendent, shall be required to perform searches as outlined in this IMPP as an essential function of their employment or contract services.

Offender searches shall not be conducted as a form of harassment or in a manner causing damage to property or the unnecessary use of force, embarrassment, or indignity to the offender.  Offenders shall not be touched any more than is necessary to conduct a comprehensive search of the offender's person.

Trained narcotic/contraband detection dogs may be utilized as part of searches of offenders and/or State property. All searches shall be performed by staff trained and qualified in canine (K-9) search procedures.

Any offender refusing to be searched may be searched by force and shall be subject to disciplinary action.  Any time force is required to conduct a search, staff shall comply with the policy regarding use of force and file appropriate reports regarding the incident.

In addition to offender searches, frequent unannounced searches of all areas of the facility shall be conducted. Such searches of facilities may be initiated by either the warden/superintendent of the facility, the Secretary of Corrections, or the Secretary's designee.  The Emergency Preparedness Coordinator shall establish a written search plan for each facility.  Each search plan so established shall become a part of that particular facility's emergency plans.  The search plans shall be reviewed annually (ACI 3-4184) and shall ensure that all areas of all facilities are searched a minimum of once every 12 months, except for offender cells/living areas, which shall be searched a minimum of once every six (6) months.  K-9 units shall be available to conduct a minimum of two (2) K-9 searches of each KDOC facility per year; special searches involving the K-9 units may be arranged between the appropriate requesting official and the warden/superintendent of a K-9 support facility.  Reports shall be prepared for the respective wardens/superintendent and/or Secretary/designee with copies provided to the Deputy Secretary of Facilities Management.

Comprehensive area searches shall be planned and scheduled, involving those staff with a need-to-know in the process.  All requests for assistance and support from other KDOC facilities shall be cognizant of the budgetary

impact of the search activity. Overtime for support facility staff shall be borne by the support facility and per-diem costs shall be the responsibility of the facility for which the support is requested.

The Secretary or his/her designee may, at any time, order a comprehensive search of any KDOC facility. Such searches may be unannounced. Comprehensive searches shall be coordinated through the Department's Emergency Preparedness Coordinator.

## DEFINITIONS

Body Cavity:  The interior of the human body not visible by normal observation; such as the anal cavity and the vagina.

Body Cavity Search:  Inspection for contraband items in the body cavity of a person conducted by medical staff using fingers or simple instruments.

Barrier Screen:  A physical barrier between humans and K-9 dogs. It allows the odor of illegal substances to flow freely from persons, personal effects and property through the screen without allowing the K-9 dog to come into direct contact with the person or elements being searched.

Canine (K-9) Searches:  The passive scrutiny of the offender, offender property and State property by dogs trained to indicate the presence of the odor of narcotics or other contraband.

Comprehensive Search:  A thorough and exhaustive search of all areas of a facility.  In order to accomplish the search in a timely manner all resources available to the Department may be utilized.

Contraband:  Any item not issued by the Department of Corrections, sold through the facility canteen or specifically authorized or permitted by order of the Secretary or warden/superintendent; or any item that, although authorized, is misused in a way that causes some danger or injury to persons or property; or any item prohibited by K.A.R. 44-2-103, 44-12-901, 44-12-902 or 44-12-903, 123-12-111, 123-12-901, 123-12-902.

Dry Cell: A cell/room where there is no running water, or where running water has been rendered inoperable.

Exigent Circumstances:  Any set of temporary or unforeseen circumstances that require immediate action in order to combat a threat to the security or institutional order of a facility.

Full-Frisk Search:  Includes all elements of a pat down search and, in addition, the loosening of clothes and belts, shaking out loose clothing and brassieres, removing shoes, visual inspection of the mouth, nose and ears without probing, search of a person's head hair by hand or with a comb, and removing wigs or prosthetic devices.

Hot Spots:  Areas identified in a facility which may realize the maximum benefit of a K-9 search, to include, but not be limited to offender cells, housing units, workshops, classrooms, access areas, etc.

Narcotics/Contraband Detection Dog:  A dog specifically trained for use in detection of the odor of contraband. Such dogs shall have received intensive training for the detection of certain types of contraband, such as drugs, explosives or firearms.  A canine is a screening device utilized to detect the presence or odor of illegal narcotics; based upon the dog's alert, the handler determines if there is reasonable suspicion or probable cause to conduct a more intrusive search, such as a strip search.

Pat-down Search:  Inspection of a fully clothed person using the hands and/or metal detector, including the removal of items from the person's clothing.  Includes inspection/search of the person's belongings or personal effects.  For purposes of searching offenders identified by the facility health authority as having cardiac pacemakers implanted within their persons, only the hands shall be employed in the search, and handheld metal detectors shall not be used.

Predetermined Random Pattern Search:  A search conducted in a systematic, controlled, fair and impartial manner based upon a consistent, plan or routine which objectively selects the individual to be searched, i.e., every third, every fifth, etc.

Reasonable Suspicion:  A subjective suspicion supported by objective, articulable facts that would reasonably lead a reasonable, experienced and prudent person to suspect an individual is in possession of contraband.

<u>Strip Search</u>:  The removal of all clothing followed by a visual inspection of all body surfaces and all body cavities without touching the person at any time.  The person may be asked to lift the breasts and genitals as applicable, and, to bend over to facilitate inspection of the vaginal and/or anal cavities.

## PROCEDURES

I.      **Grounds for Searches**

A.      Strip searches of offenders shall be conducted under the following circumstances: (ACI 3-4184)

1.      Upon initial admission; (ACI 3-4272)

2.      Upon apprehension from an escape or attempted escape; (ACI 3-4186)

3.      Upon re-entry to a medium or maximum custody facility after leaving the security perimeter; (ACI 3-4186)

a.      Re-entry to a minimum security area shall require random strip searches or K9 searches.

4.      Upon the conclusion of a contact visits; (ACI 3-4186)

5.      In response to reports of missing or stolen facility property, i.e., keys, tools, or other items which would impact the safety of staff, offenders, the public, and/or the security or maintenance of the facility operation; and

6.      Upon an offender's initial admission to segregation.

B.      Pat searches and/or metal detector searches shall be conducted prior to leaving a classroom or work area where tools or weapons material were accessible.

C.      In addition to when required in Section I.A., predetermined random pattern pat down, canine (K-9), full frisk, and/or strip searches of offenders shall be conducted whenever necessary to ensure the safety and security of the facility.

1.      Any such strip searches shall require the prior approval of the shift supervisor or a higher authority unless specifically provided for by post order.

II.     **Pat-Down, Full-Frisk, and Canine (K-9) Searches**

A.      A pat-down or full-frisk search of offenders may be conducted at any time or place.

1.      Pat-down searches of male offenders may be conducted by trained staff of the same or opposite gender as the offenders being searched.

2.      Pat-down searches of female offenders and all juvenile offenders shall be conducted by a trained staff member of the same gender only, except in exigent circumstances. (28 C.F.R. § 115.15)

3.      Staff shall be cognizant of transgender and intersex offenders and shall conduct searches in a respectful, and least intrusive, manner as possible.

4.      The facility shall document all cross-gender pat searches of female offenders as well as any cross-gender strip searches or cross-gender visual body cavity searches if such searches cannot be avoided.

B.      Canine searches shall be conducted with a search team of employees designated by the warden/superintendent to assist the dog handler(s).

1.    Officers handling the detection dogs shall be responsible to control the dog and to advise the search team members when a dog has indicated the presence of an odor of contraband;

2.    All dogs used in canine (K-9) searches shall be appropriately trained and routinely certified for reliability, per IMPP 12-114; and,

3.    All officers used as dog handlers shall be trained and qualified for the duty assignment.

4.    Canine searches shall not be conducted via direct contact between the dogs and the subjects of the search, but shall be conducted with the dogs behind barrier screens.

    a.    Under no circumstances shall the search dogs be permitted to directly search any individual.

C.    While the search is being conducted the offender shall be directed to stand in the erect position, feet apart, with arms extended outward, facing away from the person(s) conducting the search.

### III.    Strip Searches

A.    Strip searches of offenders shall be approved by the shift supervisor or higher authority and conducted by an officer trained and qualified in search procedures. (ACI 3-4186)

1.    An exception to such approval is authorized when post orders specifically provide for the predetermined random pattern strip search of offenders.

B.    Whenever possible, strip searches shall be witnessed by at least one (1) staff person in addition to the person conducting the search. If necessary, the staff person witnessing the search may do so via remote view camera observation.

1.    In those instances where a witness is not available, the complete strip search of the offender shall be recorded and preserved for a minimum of three (3) years.

    a.    Legal counsel shall be contacted prior to the destruction or disposal of such tapes.

    b.    All video recording equipment designated for use in recording strip searches shall be continuously maintained in fully operational condition in accordance with provisions of DOC IMPP 12-111/JJA 12-111.

C.    A strip search shall be performed by, and only in the presence of, employees of the same gender as the offender being searched, except in exigent circumstances. (4-JCF-2A-22) Absent exigent circumstances, any staff person witnessing the search, whether in person or via remote view camera observation, shall also be of the same gender as the offender being searched. (ACI 3-4186) (28 C.F.R. § 115.15)

D.    Strip searches shall be conducted in a private place which prevents the search from being observed by those not assisting in the search, unless the offender signs a privacy waiver, or an emergency requires that the search be conducted immediately and there is no opportunity to move to a private area or behind a privacy screen. (ACI 3-4186; 4-JCF-2A-22)

E.    When a strip search is to be conducted, the offender shall remove all articles of clothing and give them to staff for inspection.

F.    While the offender is disrobed, correctional staff conducting the search shall:

1.    Visually inspect the offender's entire body with special attention paid to the following areas:

    a.    Head;

    b.     Hair;

    c.     Mouth; (ACI 3-4186)

    d.     Torso;

    e.     Pelvic area; (ACI 3-4186)

    f.     Legs, arms, and armpits;

    g.     Feet and hands;

    h.     Ears; (ACI 3-4186)

    i.     Neck; and,

    j.     Nasal passages. (ACI 3-4186)

2.    The offender shall be required to:

    a.     Spread legs;

    b.     Bend over;

    c.     Spread buttocks; (ACI 3-4186)

    d.     Squat;

    e.     Cough;

    f.     Open the mouth and move the tongue; (ACI 3-4186) and,

    g.     Raise arms, genitals, and breasts, as applicable, during the visual inspection.

G.    At no time, during the visual inspection, shall the corrections official conducting the search touch or conduct any physical intrusion into any body cavity.

H.    If an object of any kind is observed to be in a body cavity, the offender shall be restrained until such time as a body cavity search (see Section IV.) can be conducted.

I.    The offender shall be allowed to dress, as soon as possible, following the search.

J.    All strip searches are to be documented to include offender searched, staff conducting the search, time and location.

1.    If the search is not pre-determined in post order (See Section III.A.1. above), the approving supervisor shall also be logged.

## IV.    Body Cavity Searches

A.    An offender shall be subject to a body cavity search when there is reasonable suspicion to conclude that the offender possesses contraband inside a body cavity. (ACI 3-4185)

B.    Upon approval by the warden/superintendent or warden's/superintendent's designee, body cavity searches may be conducted by appropriate medical personnel. (ACI 3-4185; 4-JCF-4C-63) Body cavity searches shall not be conducted by KDOC staff or contract medical staff.

1.    Prior to the search, written authorization shall be obtained from the warden/superintendent or designee. (ACI 3-4185)

2.      Medical personnel who perform a body cavity search need not be of the same gender as the offender being searched.  However, all other persons who are present during the search shall be of the same gender as the offender and there shall always be at least one (1) staff member present who is the same gender as the offender being searched.

3.      The search shall be conducted in a place, which prevents it from being observed by persons not conducting or assisting with the search. (ACI 3-4185)

4.      The offender shall be informed that a body cavity search has been requested and shall be asked to sign Part I of a Consent/Authorization for Body Cavity Inspection form (Attachment A).

5.      If the offender refuses the body cavity search, but the warden/superintendent or designee believes that failure to do the search presents a threat to the security and orderly operation of the facility or a clear and imminent danger to the offender or others, the warden/superintendent or designee shall complete Part II of the Consent/Authorization for Body Cavity Inspection form (Attachment A) indicating such and direct the medical person to proceed with the search.

6.      Restraints shall be utilized when determined by the warden/superintendent or designee, in accordance with KDOC IMPP 12-113/JJA IMPP 12-113, as necessary for the medical staff to perform the search.

7.      If the offender refuses the body cavity search and the warden/superintendent or designee does not believe the search should be conducted, but still has a reasonable suspicion that the offender has contraband concealed in the offender's body, the warden/superintendent or designee may order the offender be placed in a stripped, secured dry cell and provided with a bedpan.

   a.      The offender shall remain in the cell under close observation until sufficient time has passed to permit expulsion of any contraband.

   b.      All notice, hearing, and review requirements of KDOC IMPP's 20-105 and 20-106/JJA 14-105 shall be satisfied.

8.      An incident report shall be completed in accordance with IMPP 01-113D any time a body cavity search is conducted.

## V.      Dry Cell Search

A.      Upon observation or reasonable suspicion that an offender has placed suspected contraband into his/her mouth or other body cavity, the warden/superintendent or designee may, as a contraband interdiction measure, order an offender to be placed in a dry cell.  The following general requirements shall apply:

1.      The offender shall be placed on segregation status per DOC IMPP 20-104/JJA IMPP 14-104.

2.      The offender shall be immediately escorted to the segregation/isolation cell. All appropriate segregation placement procedures shall be followed.

3.      A thorough search of the cell shall be conducted prior to placement.

4.      Water to the cell shall be disabled and the toilet flushed prior to placing the offender in the cell.  This must be documented following the procedures in KDOC IMPP 20-101/JJA IMPP 14-101.

5       After consultation with the health authority, the offender may be offered a laxative, however, under no circumstances shall the offender be forcibly medicated with a laxative.

6      All items removed from, or placed in the cell shall be searched.

7.     The cell shall be searched at least once every shift.

8.     All activities such as meals, liquids given, medications, bowel movements, medical checks, searches shall be logged.

9.     The offender shall be monitored through constant observation, as well as continual observation through the use of CCTV, if available.

B.    The following conditions shall apply to offenders placed in dry cell confinement:

1.     A mattress, pillow and blanket shall be provided.

2.     The offender shall remain clothed in accordance with segregation procedures.

3.     The offender shall not be allowed personal property.

4.     The offender shall be fed in-cell the same meal as other segregation offenders.  Liquids shall be offered a minimum of every two hours.

5.     Non-staff visitors are prohibited

6.     The offender shall have the opportunity to exercise in the cell.

7.     Only legal, privileged or official mail shall be delivered to the offender.  All other mail shall be held while the offender is on dry cell status.

C.    Upon discovery of the offender having a bowel movement, the observing officer shall notify the shift supervisor. Upon the availability of assistance:

1.     The offender shall be restrained and removed from the cell.

2.     Feces and toilet paper shall be thoroughly checked by staff using appropriate protective equipment.

3.     If contraband is discovered, it shall be recovered and entered as evidence following chain of custody procedures.

4.     The shift supervisor shall be notified, and all pertinent information entered in the log.

D.    Release

1.     If a specimen has been produced and no contraband found, the offender may be released to general population upon approval of the warden/superintendent or designee.

2.     Dry cell confinement shall not exceed 72 hours, unless approved by the warden/superintendent after consultation with the health authority.

## VI.    Area Searches

A.    The warden/superintendent of each facility shall ensure that the search plan established includes specifics as to the areas to be searched, the frequency of searches, and the individuals responsible for the conduct of the searches. (ACI 3-4184)

1.     The search plan shall be reviewed at least annually and updated, if necessary.

B.    The warden/superintendent of each facility shall establish a system whereby the implementation of the search plan and the conduct of the area searches are monitored.

C.    Searches of non-K-9 support facilities shall be coordinated between the requesting facility warden/superintendent and the warden of the support unit in the designated geographic district, see Section VI.

**VII.    Cell and Living Area Searches**

A.    All offender cells/rooms shall be physically searched a minimum of once every six (6) months. A log will be maintained in the living unit to track searches.

    1.    Any time property is taken from an offender in a search, a Shakedown/Search form (Attachment B) will be completed.

B.    All common areas within the cell house/living units will be searched a minimum of once per week and documented in the unit log.

**VIII.    Canine (K-9) Searches of Facilities**

A.    The Department designates the following geographic districts for K-9 support facilities to permit the use of K-9 units in the scheduled and special searches of KDOC facilities.

    1.    The Lansing Correctional Facility shall provide support and conduct searches of:

        a.    Topeka Correctional Facility; and

        b.    Kansas Juvenile Correctional Complex.

    2.    The El Dorado Correctional Facility shall provide support and conduct searches of:

        a.    Winfield Correctional Facility; and,

        b.    Wichita Work Release Facility.

    3.    The Hutchinson Correctional Facility shall provide support and conduct searches of:

        a.    Ellsworth Correctional Facility;

        b.    Larned Correctional Mental Health Facility; and,

        c.    Norton Correctional Facility and its satellite facility.

B.    Each facility (including satellite units) shall schedule the K-9 search at least every six (6) months with dates mutually agreed upon by the requesting warden/superintendent and the K-9 support facility warden or designee.

C.    The scope of each search shall be determined based upon the needs of the requesting facility, to include any specific hot spots identified prior to the search.

D.    The warden/superintendent of the facility being searched shall require a staff member to accompany the K-9 handler and dog to prepare such disciplinary reports, document legal complaints, etc., as may be necessary during and following the search.

E.    Special searches involving K-9 units may be requested based upon unusual circumstances or situations that may develop and, in the determination of the requesting warden/superintendent, require an additional search.

    1.    Arrangements for special searches that coincide with all-employee and all-visitor searches where K-9 assistance is desired shall be made in the same manner as the facility searches.

2.  If the designated K-9 support facility is unable to accommodate the request, the warden/superintendent may contact the warden of another K-9 support facility for assistance.

3.  Complete facility searches should be undertaken when it is obvious that there is a large drug problem. In such cases, the entire KDOC K-9 handlers and their dogs would undertake the single assignment.

F.  Within 24 hours of the search a report shall be prepared by the K-9 handlers and distributed to the warden who dispatched the K-9 unit and the warden/superintendent of the searched facility.

G.  The staff member assigned by the warden/superintendent to accompany the K-9 unit during the search shall be responsible to prepare an overall search report and provide the report to the warden/superintendent of the searched facility.

## IX.  General Orders

A.  General Orders on this subject shall be limited to only those orders that are necessary to specify:

1.  Who is authorized to act as the warden's/superintendent's designee per Section IV.B.1 of this policy;

2.  The specifics involved in monitoring the facility's search plan;

3.  The circumstances in which a search is required; and,

4.  The provisions for the preservation of evidence resulting from searches, to include, at a minimum: (ACI 3-4198-1)

    a.  Chain of custody;

    b.  Evidence handling;

    c.  Location and storage requirements for evidence; and,

    d.  Notification by a written form of the facility's design to an affected offender informing him or her of any item seized from the offender's living area.

**NOTE:** The policy and procedures set forth herein are intended to establish directives and guidelines for staff and offenders and those entities that are contractually bound to adhere to them. They are not intended to establish State created liberty interests for employees or offenders, or an independent duty owed by the Department of Corrections to employees, offenders, or third parties. Similarly, those references to the standards of various accrediting entities as may be contained within this document are included solely to manifest the commonality of purpose and direction as shared by the content of the document and the content of the referenced standards. Any such references within this document neither imply accredited status by a Departmental facility or organizational unit, nor indicate compliance with the standards so cited. The policy and procedures contained within this document are intended to be compliant with all applicable statutes and/or regulatory requirements of the Federal Government and the state of Kansas. This policy and procedure is not intended to establish or create new constitutional rights or to enlarge or expand upon existing constitutional rights or duties.

## REPORTS REQUIRED

| Name/Type of Report | By Whom/To Whom | Due |
| --- | --- | --- |
| K-9 Search Report | K-9 Handler to Wardens/Superintendent | Within 24 Hours of Completion of Search |

Overall Search Report | Staff Member Designated To Accompany K-9 Unit to Warden/ Superintendent of Searched Facility | At the Conclusion of K-9 Search

## REFERENCES

28 C.F.R. § 115.15
K.S.A. 2012 Supp. 21-5914; K.S.A. 22-2521, 22-2522, 22-2524, 38-2386
K.A.R. 44-2-103, 44-12-901, 44-12-902, 44-12-903, 123-12-111, 123-12-901, 123-12-902
IMPP 01-113D, 12-111, 12-113, 12-114, 20-101, 20-104, 20-105, 20-106
JJA IMPPs 12-111, 12-113, 14-101, 14-105
ACO 2-3A-01, 2-3C-01
ACI 3-4184, 3-4185, 3-4186, 3-4198-1, 3-4272
JCF 4-JCF-2A-20, 4-JCF-2A-22, 4-JCF-4C-63

## ATTACHMENTS

| Attachments | Title of Attachments | Page Total |
|---|---|---|
| A | Consent/Authorization for Body Cavity Inspection | 1 page |
| B | Shakedown and Search Form | 1 page |

Attachment A, IMPP 12-103D
Effective 12-12-17

**KANSAS DEPARTMENT OF CORRECTIONS**
**CONSENT/AUTHORIZATION FOR BODY CAVITY INSPECTION**

**PART I**

| | |
|---|---|
| OFFENDER NAME | OFFENDER NUMBER |

On this date, I was requested to have a body cavity search. The details of such an examination have been explained to me. I understand that such an examination is to be conducted by medical personnel. I hereby:

☐  ACCEPT          ☐  REFUSE

such an examination. I understand this action is not an admission or a denial of wrongdoing. I have been informed that this inspection is being requested for reasons of facility security.

| OFFENDER'S SIGNATURE | | DATE | OFFENDER NUMBER | |
|---|---|---|---|---|
| WITNESS | DATE | WITNESS | | DATE |

**PART II**

**AUTHORIZATION BY WARDEN/SUPERINTENDENT OR DESIGNEE**

On this date I have fully explained the procedure of a body cavity search to the offender named above. Said offender has refused such inspection. In my best professional judgment, based upon a reasonable suspicion, failure to perform such an inspection presents a clear and imminent danger to this offender, others, or to the security of the facility. I therefore authorize the body cavity search to be performed without this offender's consent.

| AUTHORIZATION BY WARDEN/SUPERINTENDENT/DESIGNEE | DATE |
|---|---|
| WITNESS | DATE |
| WITNESS | DATE |

Attachment B, IMPP 12-103D
Effective 12-12-17

# CELL INSPECTION AND/OR SEARCH FORM

☐ **CELL INSPECTION**      ☐ **SEARCH**      ☐ **CELL INSPECTION & SEARCH**

(Check One)

The listed area has been inspected and/or searched on this date. Listed below are the deficiencies found and/or contraband seized.

**OFFENDER NAME:** _____      **NO.** _____   **UNIT** _____   **CELL #** _____

             (Last)        (First)

**SHOP/AREA:** _____

| ITEM SEIZED | DISPOSITION |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

**A: Held for Evidence        B: Destroyed        C: Returned        D: Other        E: To EAI**

## EQUIPMENT INSPECTION

| ITEM | MODEL | SERIAL NO. | COLOR | CONDITION |
|---|---|---|---|---|
| TV |  |  |  |  |
| Radio |  |  |  |  |
| Headphones |  |  |  |  |
| Hot Pot |  |  |  |  |
| Fan |  |  |  |  |
| Typewriter |  |  |  |  |
| Clock |  |  |  |  |
|  |  |  |  |  |

## DEFICIENCIES WHICH NEED CORRECTED (ITEMS CIRCLED):

1. ELECTRICITY LEFT ON (LIGHTS, FAN, RADIO, TV, HOT POT, _____)

2. DAMAGE TO STATE PROPERTY

3. DAMAGE TO PERSONAL PROPERTY

4. FIRE HAZARD (EXCESS PAPER, FAULTY EQUIPMENT OR CORD, _____)

5. EXCESS TRASH

6. SANITATION (FLOOR WALLS, TOILET, SINK, FIXTURES, LIGHT, SHOWER, LEDGES, BUNK, WINDOWS, PERSONAL PROPERTY, _____)

7. MISUSE OF ITEMS (EXTENSION CORDS, EAR PHONES, PICTURES, _____)

8. BED NOT MADE

COMMENTS: _____
_____

OFFICER: _____ DATE: _____ TIME: _____

cc:  Warden/Superintendent/Master file (white); EAI (canary); Offender (goldenrod)

# KANSAS DEPARTMENT OF CORRECTIONS

| Kansas Department of Corrections | El Dorado Correctional Facility<br><br>**G**ENERAL<br>**O**RDERS | SECTION NUMBER<br><br>10-102 | PAGE NUMBER<br><br>1 of 3 |
|---|---|---|---|
| | | **SPECIAL MANAGEMENT RESIDENTS:**<br>**Restrictive Housing Unit** | |

| **Approved By:**<br><br>*J. L. Williams*<br><br>**Warden** | **Original Date Issued:** | **06-20-1991** |
|---|---|---|
| | **Current Amendment Effective:** | **02-03-2024** |
| | **Replaces Amendment Issued:** | **05-18-2023** |

## POLICY

Operating procedures of the restrictive housing units shall provide for the overall safety of staff and residents while maintaining humane living conditions and structure that contributes to the resident's rehabilitation process.

## DEFINITIONS

None.

## PROCEDURES

I.    **General Restrictive Housing Unit Guidelines**

    A.    Restrictive housing residents shall be under staff escort and constant monitoring when outside of their cells.

        1.    Residents assigned to restrictive housing living units shall not be removed from their cells without authorization of the living unit supervisor.

        2.    Special management residents shall be escorted by a minimum of two (2) staff; either two uniformed officers or one uniformed officer and one unit team member who has completed the basic corrections officer training course with the Kansas Department of Corrections.

        3.    Residents assigned to transitional programs may be escorted utilizing less restrictive procedures as established by program format and published in the living unit rules.

        4.    When behavioral health deems it necessary to restrict or prohibit a resident from a normally authorized item or activity, a written report explaining the reason(s) for the action shall be completed and submitted to the Chief of Security.

            a.    A copy of the observation instructions and allowable items shall be placed on the resident's cell door.

II.    **General Procedures for Limited Contact Status**

    A.    The use of the limited contact status shall be considered following a request by the unit manager or the shift supervisor under the following circumstances:

1.    The resident is physically abusive to staff and/or other residents.

2.    The resident is threatening staff or residents, has just required intervention by the forced cell move team, has escaped from his restraints, or has a demonstrated history of violent and/or assaultive behavior.

3.    The resident is inflicting damage to the physical properties of the unit and it reasonably appears that the resident will continue to do so.

B.    During normal business hours, approval from the Warden or Deputy Warden shall be obtained prior to placement of a resident on limited contact status.

C.    On weekends, holidays, after normal business hours, or in the absence of the Warden or Deputy Warden, the shift supervisor shall contact the facility duty officer for approval.

D.    The placement process shall be documented by using the KDOC Incident Reporting System.

E.    When placing a resident in a limited contact cell following exposure to chemical agents during a force cell move, the shower shall be turned on and the OIC of the force cell move team shall instruct the resident to decontaminate himself for a minimum period of two (2) minutes.

F.    A flexible periscope type viewing device may be used to view a resident who attempts to hide from staff in the shower or other area in the cell where he cannot be readily seen by staff.

III.    **Alternative Meal Procedures**

A.    When a resident in restrictive housing is placed on an alternative meal service under provisions set forth in IMPP 10-106D Standardized Menu, Ensuring Nutritional Adequacy of Diets, and Meal Service Schedules, IMPP 10-119D Medical and Religious Diets and Vegetarian Alternative Menus, and/or IMPP 12-119D Resident Hunger Strike, the following procedures shall be followed:

1.    The Facility Alternative Meal Order (Attachment A) shall be used to document residents placed on an alternative meal service or feeding procedure.

a.    During business hours, alternative meal service shall be approved by the warden and the facility health authority.

b.    During non-business hours, the shift supervisor shall receive verbal approval from the duty officer and the senior on-duty medical staff with notification made to the Unit Manager for presentation to the warden on the next working day.

c.    The unit manager shall ensure the living unit supervisors monitor and document the delivery of alternative meals to restrictive housing residents.

2.    Residents who have obstructed closure of the food pass shall not receive meal service, including alternative meal service, until relinquishing control of the food pass and positioning themselves in manner that does not endanger staff.

a.    Meal service shall be restored once delivery of the meal does not place staff in danger.

b.    Meals withheld from a restrictive housing resident for failure to follow feeding procedures shall be documented in the living unit logs and to the unit manager.

3.    Copies of alternative meal service documents shall be forwarded to the Chief of Security and to the records department for placement in the resident central file.

**Note:** The general orders set forth herein are intended to establish directives and guidelines for staff, offenders and those entities who are contractually bound to adhere to them. They are not intended to establish State

created liberty interests for employees, offenders or an independent duty owed by the Department of Corrections to either employees, offenders or third parties. This General Order is not intended to establish or create new constitutional rights or to enlarge or expand upon existing constitutional rights or duties.

Authority to override policy as written in this General Order may only be authorized in writing by the Warden. In an emergency, the Incident Commander may temporarily suspend the General Order for the duration of the time to restore order to the facility and it shall be logged in the emergency log.

## REPORTS REQUIRED

None.

## REFERENCES

IMPP 10-106D, 10-119D, 12-119D

## ATTACHMENTS

| Attachment | Title of Attachment | Page Total |
|---|---|---|
| A | EDCF Alternative Meal Order | 1 page |

Attachment A, EDCF 10-102
Effective 05-18-23

## EDCF ALTERNATIVE MEAL ORDER

Resident Full Name & Number: _____

Cell: _____ is being placed on the below alternative meal and service status in accordance with IMPP 10-106D, 10-119D, and/or 12-119D.

Reason for alternative meal service: _____

_____

_____.

Alternative meal service begins with the <u>BREAKFAST – LUNCH – DINNER</u> meal on _____.
(circle beginning meal)                                    (date)

Alternative meal service ends with the  <u>BREAKFAST – LUNCH – DINNER</u> meal on _____.
(circle ending meal)                                    (date)

<u>ALTERNATIVE MEAL:</u> (select one)

Loaf              _____          Sack Lunch    _____

Finger Food   _____          Liquid             _____

<u>SERVING STATUS:</u>

Select one:     Regular tray    _____          Paper           _____          Other (specify) _____

Select one:     With Utensils   _____          W/O Utensils   _____

Select one:     Containers       _____          W/O Containers _____

Signature of requesting behavioral health, shift supervisor or unit manager: _____

Name of approving Duty Officer If placement is requested during non-business hours: _____

Circle one:     APPROVE     DISAPPROVE     _____
                                                              Signature of on-duty facility health authority:

Circle one:     APPROVE     DISAPPROVE     _____
                                                              Signature of Warden (copy to records after approval)

Copies: Resident Cell Door, Warden, Chief of Security, Unit Manager, Behavioral Health, Food Service, Resident